EMERGENCY MEDICAL CARE, INC.,
doing business as Trauma Systems,
Inc., Plaintiff–Appellant,

v.

MARION MEMORIAL HOSPITAL,
Defendant–Appellee.

No. 95–3548.

United States Court of Appeals,
Seventh Circuit.

Argued May 17, 1996.

Decided Aug. 30, 1996.

Harry W. Wellford, Jr. (argued), Charles M. Poplstein, Gerard K. Rodriguez, St. Louis, MO, for Plaintiff–Appellant.

Pamela S. Lacey (argued), Hart & Hart, Benton, IL, for Defendant–Appellee.

Before CUMMINGS, BAUER, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

This case involves a dispute between Emergency Medical Care, Inc. ("EMC") and Marion Memorial Hospital about an anti-raiding/liquidated damages provision in their former agreement. The district court granted summary judgment in favor of the Hospital, finding that it had not breached the agreement. We agree and affirm.

## BACKGROUND

In May 1987, EMC and the Hospital contracted for EMC to provide physicians to staff the Hospital's emergency room. The Hospital properly terminated the contract in August 1993, and entered into a similar contract with Healthline Management, Inc. ("HMI"). So far so good. The problem arose, however, after HMI scheduled to work in the emergency room a number of physicians who previously had been affiliated with EMC. EMC claims that this violated the anti-raiding provision of its agreement with the Hospital, which states:

> It is expressly agreed between the Hospital and EMC that due to the nature of the business of EMC, the expertise exercised by EMC in securing services of physicians, and the irreparable harm to EMC resulting from loss of said physicians due to the limited number of physicians that provide said services and due to the cost and expense incurred by EMC in obtaining said services of physicians, during the term of this Agreement and for a period of two (2) years thereafter, Hospital will not directly or indirectly enter into any agreement covering the same or similar services as are provided herein with any physician introduced to it by EMC or with whom it came into a business or professional relationship as a result of this Agreement, except that EMC shall not prevent any physician who

holds active membership from treating his patients in the Hospital Emergency Room.

> In the event the Hospital does enter into an employment, independent contract, consultant, or other agreement with such a physician, EMC shall be entitled to liquidated damages in the amount of twenty thousand dollars ($20,000) per physician as full, final and complete payment for all damages and rights arising under this paragraph. The parties agree that this amount is reasonable as damages.

Article V, Paragraph J.

EMC sued the Hospital, alleging that the Hospital had violated Paragraph J by its "use and utilization" of HMI physicians who also had worked at the Hospital while affiliated with EMC. The Hospital raised a variety of defenses, but mainly argued that it had not breached the contract because it had neither "directly" nor "indirectly" contracted "with" the former EMC physicians, and that in any event, Paragraph J was an unenforceable restraint on trade.

The parties filed cross-motions for summary judgment, agreeing that the only matter in dispute was the meaning of Paragraph J. The district court bypassed the enforceability question and went straight to the merits of the breach of contract question. It found that the Hospital had not breached Paragraph J because it had not

> contracted with the physicians, directly or indirectly. It would clearly be a breach of the anti-raiding provision if the Hospital had hired one of these physicians to work in the emergency room. In this instance the Hospital has not hired the physicians about whom EMC complains. It appears to this Court that EMC's proper recourse, if any, is through whatever contractual agreement it may have had with those individual physicians.

Accordingly, the district court entered summary judgment in favor of the Hospital and EMC appealed.

## ANALYSIS

 This case, governed by Illinois law, involves the application of a host of well

known contract interpretation principles, starting with the old saw that we begin our analysis with the language of the contract itself. *Church v. General Motors Corp.*, 74 F.3d 795, 799 (7th Cir.1996). If the language unambiguously answers the question at issue, the inquiry is over. *Id.* (citations omitted). A contract is intrinsically ambiguous if "its language is reasonably and fairly susceptible to more than one meaning." *CSX Transp. v. Chicago and North Western Transp.*, 62 F.3d 185, 189 (7th Cir.1995). However, the fact that the parties disagree over the precise meaning of a contractual provision does not render the contract ambiguous. *See Matter of Envirodyne Industries, Inc.*, 29 F.3d 301, 304 (7th Cir.1994); *Omnitrus Merging Corp. v. Illinois Tool Works*, 256 Ill.App.3d 31, 195 Ill.Dec. 701, 706, 628 N.E.2d 1165, 1170 (1993). Instead, "when opposing parties agree that the document whose meaning they dispute is not ambiguous, all they mean is that they are content to have its meaning determined without the help of any 'extrinsic' evidence." *Envirodyne*, 29 F.3d at 304.

■ In interpreting a contract, Illinois law requires that "clear and unambiguous terms in the contract must be given their ordinary and natural meaning." *CSX Transp.*, 62 F.3d at 190. Illinois courts also apply the principle of construction that a contract must be interpreted as a whole, giving meaning and effect to each provision. *Id.* Finally, because Illinois courts favor fair competition and disfavor restraints on trade, we must strictly construe noncompetition agreements against the party seeking restriction. *Diepholz v. Rutledge*, 276 Ill. App.3d 1013, 213 Ill.Dec. 643, 645, 659 N.E.2d 989, 991 (1995).

■ With those general statements of law as background, we move on to their application to this case. We review the district court's summary judgment ruling, including the conclusion that the contractual provision in question is unambiguous, *de novo*, applying the usual standards. Fed.R.Civ.P. 56. Both parties argue that this is a simple case and that the result is dictated by the language of Paragraph J. We agree with both

propositions. Nevertheless, we must choose between the parties' interpretations of the provision. As we stated above, the fact that the parties offer different interpretations of the agreement does not make it "ambiguous" as a matter of law. *Envirodyne*, 29 F.3d at 304. We conclude that Paragraph J is unambiguous so that it is unnecessary to resort to extrinsic evidence in order to interpret the provision. Paragraph J is reasonably and fairly susceptible to only one meaning.

This case comes down to the meaning of the phrase "directly or indirectly enter into any agreement ... with [a former EMC-affiliated] physician." Because these terms are not defined in the agreement, we look to their common and ordinary meaning. *Church*, 74 F.3d at 799. Both parties agree with this principle, but disagree with its application. The Hospital asserts that it did not breach the agreement because it did not enter into any agreement "with" the physicians in question. In its complaint and before the district court, EMC argued that the language in question prohibited the Hospital from "using or utilizing" these physicians. In this court, EMC continues to argue that "directly or indirectly" means "use or utilize."

■ After considering both parties' arguments, we come down on the side of the Hospital. Given our mandate to look to the precise language of Paragraph J, we simply do not see how the Hospital's arrangement with HMI constitutes an agreement between the Hospital and the physicians. EMC concedes that it is not a "direct" agreement, but insists that it falls squarely within the "indirect" clause of Paragraph J.[1] We have a hard time divining what might constitute an indirect agreement *with* the physicians. Of course, this is not to say that the "indirectly" language is meaningless. While we are unsure what it might encompass, we are sure that it does not cover the HMI agreement. EMC has not provided any examples, relying instead on its argument that the provision really means "use and utilize."

EMC quotes a dictionary definition of "indirect" in an effort to demonstrate that the

---

1. At oral argument, EMC's counsel argued that the Hospital's agreement to credential the HMI doctors constituted a direct agreement pursuant to Paragraph J. We think not. Credentialing involves merely the Hospital's acknowledgment of a physician's qualifications.

Hospital's agreement with HMI constitutes an "indirect" agreement with the physicians. It then extrapolates from the definitions, which include "not straightforward and open," to argue that "the parties intended to prevent the Hospital from utilizing the EMC provided physicians by *any* means within the agreed time period." This interpretation fails a common sense rule of contract interpretation because, had the parties intended to prevent the hospital from "using or utilizing" any of the doctors formerly on EMC's roster, the contract should have said so. *See Diepholz,* 213 Ill.Dec. at 645, 659 N.E.2d at 991.

To summarize: we conclude that Paragraph J is unambiguous and that the Hospital did not breach the provision by utilizing HMI doctors who previously had affiliated with EMC. The hospital's agreement was "with" HMI and not the physicians. End of subject.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.[2]

AFFIRMED.

---

**2.** In light of our disposition of this case, we need not reach the Hospital's argument that Paragraph J is unenforceable. By the same token, we also need not reach EMC's *quantum meruit* argument given that EMC concedes that it "only comes into play in the event that [Paragraph J were] deemed unenforceable."