In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3927

Interim Health Care of Northern Illinois, Inc.,

Plaintiff-Appellant,

v.

Interim Health Care, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 98 C 5259--David H. Coar, Judge.

Argued April 12, 2000--Decided August 25, 2000

Before Cudahy, Coffey and Kanne, Circuit Judges.

Cudahy, Circuit Judge.  In 1981, registered nurse Nancy Williams began working at the Evanston, Illinois franchise of a national company called Interim Health Care (Interim-Evanston),/1 which provided temporary medical services in patients' homes. She eventually became the administrator of the office. In 1986, Williams bought the Evanston franchise of Interim Health Care. The Evanston franchise served Chicago's northern suburbs; two other franchises, located in Oak Park, Illinois and Joliet, Illinois, served other areas in suburban Chicago. In 1991, the national office of Interim (Interim-National) purchased the Oak Park franchise, and began operating it. Also that year, Interim-National purchased a company known as Professional Nurses Bureau, which provided temporary medical services on the North Side of Chicago.

Interim-National's decision to begin operations in the Chicago area led to tensions with Williams. Williams charges that Interim-National began serving patients in her territory in violation of her franchise agreement. And she charges that Interim-National began cutting Interim-Evanston out of contracts to provide services to national clients with patients in the Evanston area. In late 1997, Interim-National offered to buy Interim-Evanston, but Williams refused. In May 1998, Williams apparently missed

the deadline for renewing her franchise. By August 1998, Interim-National advised Interim-Evanston that it was in default on its royalty payments. Interim-National then terminated Interim-Evanston's franchise. Interim-Evanston sued Interim-National for breach of contract, breach of the implied duty of good faith, tortious interference with its business relationship and unjust enrichment and requested an accounting. The district court granted summary judgment in favor of Interim-National on the contract, good faith, tortious interference and accounting claims, but denied summary judgment on Williams's claims of unjust enrichment. Williams now appeals the grant of summary judgment.

We review the district court's grant of summary judgment resulting from its contract interpretation de novo. See Winter v. Minnesota Mutual Life Ins. Co., 199 F.3d 399, 405-06 (7th Cir. 1999). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

I.  Breach of Contract

Williams charges that when Interim-National "encroached" on her territory, it violated the terms of her franchise agreement. Both parties seem to agree that Illinois law applies to this contract dispute. See Appellant's Br. at 37-38; Appellee's Br. at 36-44. We will not question their understanding. See, e.g., Bird v. Centennial Ins. Co., 11 F.3d 228, 231 n.5 (1st Cir. 1993). There are two types of contractual ambiguity: intrinsic and extrinsic. Intrinsic ambiguity exists when the agreement itself is unclear, and extrinsic ambiguity exists when a perfectly clear agreement is unclear when applied to the real-world context of the deal. See FDIC v. W.R. Grace & Co., 877 F.2d 614, 620 (7th Cir. 1989). In Illinois, clear and unambiguous terms in a contract are given their "ordinary and natural meaning." See Emergency Medical Care, Inc. v. Marion Memorial Hosp., 94 F.3d 1059, 1061 (7th Cir. 1996). Ambiguity can be found only if the contract language is "reasonably or fairly susceptible of more than one construction." A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp., 132 Ill. App. 3d 325, 328 (1st Dist. 1985).

Illinois courts endeavor to construe contracts as a whole, giving meaning to each provision. See Emergency Medical Care, 94 F.3d at 1021. The fact that parties disagree about the meaning of a contractual provision does not mean the contract is ambiguous. See id. And, because Illinois courts favor competition and frown on restraints on trade, "we must strictly construe noncompetition agreements against the party seeking restriction." Id.

Applying these well-worn contract principles, we must decide whether the franchise agreement is either intrinsically or extrinsically ambiguous. The franchise agreement was first drafted in 1973. The agreement has remained essentially unchanged for almost thirty years./2 Paragraph 1 of the agreement states that:

Company hereby grants, and Licensee hereby accepts, for the period, within the area hereinafter described . . . the right and license . . . to operate a temporary help service franchise for the sole purpose of furnishing and supplying individuals or group services of personnel, in office, clerical, nursing, dental and medical occupations. This franchise shall not extend to the operations of a temporary help service in any other occupations or for any other purpose, which is specifically reserved to the Franchisor.

Paragraph 2 of the agreement states that:

This franchise is for the area described as follows [geographic terms found here] and Company agrees that, as long as Licensee shall not be in default hereunder, neither it nor any person or firm authorized or licensed by it shall establish an office for the purposes heretofore described, within the foregoing area.

R.8 at Exhibit A (emphasis added).

Interim-National argues that because a comma appears between "described" and "within," the "within the foregoing area" phrase modifies the entire preceding phrase, and not just the word "purposes." Therefore, it argues, the geographical limitation applies only to the placement of an office that provides health care. Williams takes the opposite position, that "within the foregoing area" modifies the phrase "for the purpose heretofore described," meaning that regardless of where Interim-National's office sits, it may not provide health services in her territory. Williams contends that this reading is more sensibly synthesized with paragraph one, which specifically reserves to the franchisor only the right to operate a temporary

employment agency offering non-medical services. Williams contends these two paragraphs together create mutually exclusive rights in the franchisee and franchisor. The former has an exclusive territory for the provision of temporary health services, and the latter has the exclusive right to provide other temporary services in that territory.

Although we think Interim-National places too much weight on the lone comma in this passage, we agree that the "ordinary and natural" meaning of the words does not suggest that the franchisor is prohibited from providing health care services in the Evanston region. The phrase referring to health care provision, "for the purposes heretofore described," is a descriptive phrase, modifying the direct object of the passage, which is "office." See, e.g., Robert Perrin, The Beacon Handbook at 144-47 (5th ed. 2000). This suggests that the national franchisor is prohibited from establishing an office (of a certain type) in the territory. This language squares with the language of paragraph one, which specifically permits the franchisor to offer services of another type--non-medical--in currently franchised territories.

In so interpreting the language, we are giving the words their "ordinary and natural meaning" without questioning the logic of that meaning, which is appropriate in evaluating intrinsic ambiguity. The result is similar to the one we reached in Emergency Medical Care. In that case, a hospital terminated its contract with one company that provided emergency room physicians, and hired a similar company to provide the same service. See 94 F.3d at 1060. The hospital had agreed not to "directly or indirectly enter into any agreement . . . with any physician" the first company had introduced to the hospital. Id. The second company hired some of the same doctors that the first company had hired, and the first company contended this constituted an indirect agreement by the hospital with the physicians, in violation of their contract. Id. We held that the hospital entered an agreement with the second company, which did not amount to an indirect agreement with the physicians. See id. at 1061. We rejected the company's argument that a bar on "indirect agreement" was actually intended to prevent the hospital from using the physicians "by any means." Id. at 1061-62. The same principle, requiring us to construe the words' plain meaning rather than a broader meaning, applies in the present case. The language bars the establishment of an office for certain purposes in the Evanston territory. It does not bar the establishment of an office for those same purposes outside the Evanston territory, which

means that the provision of health services in the Evanston area from an extraterritorial office is permissible. Had the parties wished to wholly restrict the provision of health care in the territory, they could have said so.

The Illinois appellate court took a similarly literal approach in Diepholz v. Rutledge, 276 Ill. App. 3d 1013 (4th Dist. 1995). In Diepholz, an automobile dealer sold his dealership, and signed a non-compete clause which required him to "refrain, directly or indirectly . . . from engaging in the automobile sales or service business . . . in Coles County, Illinois." See id. at 1014. The seller bought a dealership in an adjacent county, where he began soliciting former customers who lived in Coles County, and running newspaper and radio advertisements in Coles County. The court concluded that the contract did not specifically forbid the seller to advertise or solicit in Coles County; it only barred him from selling or servicing cars there. See id. at 1016-17. In the present case, the exact language of the contract forbids Interim-National from establishing an Evanston office that administers home health care, but it does not specifically bar it from soliciting or servicing clients from outside the territory's boundaries.

Williams says the exclusivity of her territory is demonstrated by another provision of the contract, which states that Interim-National will furnish her with national account leads. Williams reasons that because Interim-National was ostensibly obligated to furnish all national account leads that would involve Evanston patients, this meant that Interim-Evanston "was contractually entitled to all business in its territory, and there would be no basis to hold that [Interim-Evanston] is entitled to all business in its territory under paragraph 7, but not under paragraphs 1 and 2." Appellant's Br. at 28. But even if Interim-National were obligated to turn over all the national account leads it unearthed (as discussed below, we are not sure it was), this does not amount to a grant of an exclusive territory to Interim-Evanston. This provision would not prevent other Interim franchises from developing their own local accounts in the Evanston region, and servicing them from offices outside the Evanston territory. And the language does not explicitly bar Interim-National from developing local accounts and keeping them for itself. So the promise to furnish national account leads does not add any ballast to Williams's argument that the language of the contract granted her an exclusive territory or is intrinsically ambiguous on that point.

Williams also argues that the contract is extrinsically ambiguous, because the temporary home health care industry "is not a location-sensitive business." Appellant's Br. at 9 (quoting Williams's expert witness). Therefore, she suggests, anyone in the industry would have recognized that a geographic limit on office location was of little value, and would have taken the phrase to indicate a limit on the actual provision of services. But extrinsic ambiguity requires an objective disparity between language and reality, not merely an inference of disparity based on one party's potentially self-serving opinion about the language at issue. For instance, as we explained in Rosetto v. Pabst Brewing Co., 217 F.3d 539 (7th Cir. 2000), the notorious contract in Raffles v. Wichelhaus, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864), was extrinsically ambiguous because, although its reference to the ship Peerless, was clear on paper, the reality was that two ships sailing from the port in question at the time in question bore the same moniker. So a term that purported to identify a single ship to provide the contracted-for transportation could not, in reality, do so. In this case, the parties agreed that Williams would have the right to establish the only Evanston office for the provision of health care services. Reference to the real-world meaning of "office" in the home health sector does not reveal that the contract term failed to identify the thing bargained for. While office location in the home health industry may not be of paramount significance, we are skeptical that it is altogether irrelevant, as it would have to be for Williams's extrinsic ambiguity argument to succeed. While the individual consumers of home health services may not be motivated by the location of an office they do not plan to visit, corporate clients and potential employees may very well affiliate with one purveyor of home health services rather than another based on office location. For instance, the parties agree that Interim "is required to train employees on blood borne pathogens and other safety issues, and to offer Hepatitis B vaccinations. Those functions are performed at the IHC office location." See R.52 at 6 (Def. Rule 12(M)(3) Statement of Material Facts in Support of Its Motion for Summary Judgment); R.60 at 8 (Pl. Rule 12(N)(a) Response to Def. Statement of Facts in Support of Its Motion for Summary Judgment). In addition, clinical operations managers work out of the office, and participate in patient care conferences with medical staffers who work in the office. So a temporary agency may find it easier to recruit workers if it can promise that neither patient visits nor required office visits will entail long-distance trips.

Moreover, location was likely of considerable importance in 1973, when this contract was drafted. At that point, before the introduction of direct deposit of paychecks, facsimile machines, e-mail and the like, there was undoubtedly some value in operating an office in the vicinity of likely staffers and clients. For instance, temporary nurses and doctors likely stopped by the office to pick up their paychecks. The franchisee probably drove from the franchise office to client offices to solicit business or pick up paperwork--making a nearby franchise office more convenient. Notably, the use of facsimile machines and direct deposit was underway in 1986, suggesting that the importance of office location may have been diminishing when Williams signed this contract. In spite of this trend, she did not attempt to negotiate a stronger protection of her territory. Consequently, the real-world context in which this agreement was to be performed does not reveal an obvious ambiguity in the language.

Based on the foregoing, we do not find the contract to be either intrinsically or extrinsically ambiguous. Therefore, we need not examine extrinsic evidence to discern the parties' intent. However, we note that the extensive extrinsic evidence before us does not seem to demonstrate that this contract created an exclusive territory. Williams's evidence consists largely of statements by Interim-National officials indicating that the company's policy was to discourage cross-border servicing of patients by those outside the franchise territory, and that it occasionally favored reimbursing franchisees when others served clients in their areas. Even if we take these statements as true, this does not establish that Interim-National understood the franchise agreement to bar such cross-border arrangements. As we have explained in the past, if a contract gives one party the option of taking certain action, that party may exercise the option without undertaking an obligation to act accordingly in the future. See R.T. Hepworth Co. v. Dependable Ins. Co., 997 F.2d 315, 320 (7th Cir. 1993). On the other hand, if the contract is silent about a certain obligation and one party honors it regularly, then he may be said to have assumed the obligation. See id. In the present case, this contract gives Interim-National the right to provide (on its own, or by licensing a franchisee) health services in the Evanston area, so long as it does not establish an office in that area. While Williams has presented significant evidence that Interim opposed such cross-border servicing as a rule, she has also presented significant evidence that the policy was not uniformly followed. The Oak Park office,

both when owned by a franchisee and when owned by Interim-National, often served patients outside its service area. It is unclear how diligently Interim-National tried to stop this "poaching," but under the contract it was not obligated to stop it at all. So an occasional effort to deter the practice does not establish a legal obligation to police it. In fact, some of the extrinsic evidence suggests that Williams may have understood that the contract allowed for such cross-border servicing. While serving as administrator of Interim-Evanston for the previous owner, Williams was aware that other offices occasionally placed nurses inside the Evanston territory, and that on rare occasions the Evanston franchise might serve patients in other territories. See R.54, Ex. F at 17-19; Ex. E at 19-20. So Williams's extrinsic evidence does not conclusively establish that the franchise agreement barred such activity. Additionally, Williams did not try to negotiate stronger exclusivity language when she purchased the franchise, despite the knowledge gleaned as office administrator that cross-border servicing of patients took place from time to time. See id. Even if the contract were intrinsically or extrinsically ambiguous, the extrinsic evidence before us does not clearly spell out a prohibition on cross-border servicing of patients. In sum, the franchise agreement permitted Interim-National to serve patients in the Evanston area, and therefore it did not breach the contract by doing so./3

II.  Breach of Duty of Good Faith

   Williams next charges that Interim-National violated its duty of good faith and fair dealing under the contract by (a) encroaching on her territory and usurping her leads, and (b) terminating the franchise. In order to properly evaluate this claim, we must examine further whether Interim-National was obligated to furnish national account leads to Interim-Evanston.

   The contract specifies that Interim-National "agrees to . . . [c]ooperate with Licensee in obtaining contracts for its services from government or industry . . . [and f]urnish national account leads . . . ." Verified Amended Complaint, Ex. A at 3-4. Williams argues that this language obligates Interim-National to provide her with all national account leads that involved patients in the Evanston territory. Interim-National maintains the language is merely hortatory and permitted it to forward leads at its discretion, which it did unless it questioned the franchise's ability to handle the business. The district court determined that Interim-National was not required to furnish all such

account leads to Williams. We think the promise to "furnish national account leads" is intrinsically ambiguous, because it does not specify whether all or merely some leads would be forwarded. However, both parties agree that Interim-National would not furnish absolutely all national leads it unearthed--at most it would furnish all leads pertaining to the Evanston region, and at least it would furnish those Evanston leads it thought the franchisee could handle. We might attempt to further define the scope of Interim-National's discretion based on the course of performance between the parties, but they have given us virtually no such evidence. So, for the purposes of evaluating Williams's breach of good faith claim, we arrive at roughly the same place as the district court: Interim-National had some discretion in forwarding leads to Interim-Evanston.

The district court viewed Williams's breach of duty of good faith claim as a separate legal theory, reasoning that if Interim-National had no obligation under the contract to refrain from providing health services in Evanston, or to furnish all national account leads, there was no basis for a duty of good faith. The district court further reasoned that so long as Interim-National had good cause to terminate the franchise--Williams's monetary default-- the termination was not in bad faith. With respect, we think the district court took the wrong view of this claim.

In Illinois, a covenant of good faith and fair dealing is implied in every contract absent express disavowal. See Martindell v. Lake Shore Nat'l Bank, 15 Ill. 2d 272, 286 (1958). Problems relating to good faith performance are most common where one party to an agreement is given wide discretion, and the other party must hope the discretion is exercised fairly. See Dayan v. McDonald's Corp., 125 Ill. App. 3d 972, 990 (1st Dist. 1984). In the case now before us, the parties agree that the franchise agreement vested Interim-National with some unspecified level of discretion to refer national account leads to Interim-Evanston. When one party to a contract is vested with contractual discretion, it must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties. See id. at 991.

In Dayan, which is a close cousin to the present case, the McDonald's Corporation permitted a French businessman to open several franchise outlets in Paris. For a period of years, the franchisee failed so-called quality,

service and cleanliness inspections. The franchise agreement clearly spelled out that failure to adhere to the McDonald's cleanliness standards was a basis for terminating the franchise. The company repeatedly told the franchisee that he was falling short, and offered to help him bring his stores into compliance. The slovenly conditions persisted and the franchise was terminated. See id. at 981. The franchisee contended that McDonald's real motive in terminating the franchise was to obtain the lucrative Paris market. See id. at 993. The Illinois court held that McDonald's had good cause for the termination; that alone was enough to satisfy the covenant of good faith, even assuming the company's secondary motives were less than pure. See id. We reached a similar result in another case of franchise termination, Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273 (7th Cir. 1992). But in Original Great American, we suggested that if a contract party invoked a reasonable contract term dishonestly to achieve a purpose "contrary to that for which the contract had been made," such a course would amount to bad faith. Id. at 280.

We do not think that in allowing or initiating cross-border servicing of patients Interim-National violated the duty of good faith because the terms of the contract permitted this activity. But the contract is far less conclusive on the subject of referring account leads--the parties agree that Interim-National may decide to withhold some account leads, but the contract is vague about which leads it may withhold, and what justifies withholding. Interim-National had wide discretion, and its exercise of that discretion was governed by a duty of good faith. See, e.g, Dayan, 125 Ill. App. 3d at 991. This means it was not permitted to withhold national account leads for improper motives, or in a manner inconsistent with the reasonable expectations of the parties. Interim-National now claims it withheld leads because it was dissatisfied with Williams's performance--it contends that patients had trouble reaching her and that she kept irregular office hours--and doubted she could handle the additional business. See Appellee's Br. at 7, 19. But the franchise agreement does not condition the furnishing of account leads on performance. And there is no evidence that Interim-National advised Williams informally that it would withhold leads if her performance waivered. Moreover, the national franchisor did not, so far as the appellate record reflects, notify Williams of its displeasure. In this respect, the case is at the opposite end of the spectrum from Dayan, in which the court found good faith after McDonald's representatives clearly spelled out

the consequences of subpar performance, repeatedly inspected the franchisee's stores and consulted with him frequently over a period of more than five years to help him try to rectify the problems. In the present case, the franchise agreement specifically states that Interim-National will furnish franchisees with materials to help them abide by Interim-National standards and use Interim-National procedures. These provisions establish a reasonable expectation by both parties that the franchisor would make remedial efforts with struggling franchisees. This is particularly so if a benefit to be accorded Williams--national account leads--depends on her adherence to corporate standards. In light of the contract's implicit assurances of franchisee assistance, and its silence as to the link between performance and account leads, the failure to advise Williams that she was jeopardizing her access to national account leads by poor performance weighs against a finding that Interim-National exercised its discretion in accord with the reasonable expectations of the parties.

Additionally, Dayan states that discretion must be exercised "with proper motive." While in Dayan it was alleged that the corporation coveted the franchisee's territory, the corporation in that case did not appear to place that desire above its duty of good faith to the franchisee. Instead, it made extensive efforts to help the franchisee address his problems before terminating the franchise. In the present circumstance, there is evidence in the record that Interim-National made several attempts to purchase the Evanston territory, and that it was launching a corporate presence in the Chicago area (by purchasing the Oak Park franchise and buying an unaffiliated temporary service in the city). There is no evidence in the record, other than the conclusory deposition testimony of one Interim-National official, that Williams's franchise was underperforming before Interim-National became involved in accounts that the Evanston franchise had previously serviced. So it is not beyond the bounds of speculation that Interim-National may have exercised its discretion to withhold national account leads with improper motive, thus indicating a breach of the covenant of good faith and fair dealing. We at least think there is a genuine issue of material fact lurking here regarding the genuine reason for Interim-National's decision and the veracity of its claims that Williams's franchise was subpar. So we think the grant of summary judgment was improper.

The same concerns lead us to reverse the district court's conclusion that Interim-National

did not violate the duty of good faith by terminating the franchise agreement. The district court reasoned that so long as the franchisee violated a term of the franchise agreement, the franchisor had good cause to terminate. Here, Williams defaulted in her duty to make royalty payments to Interim-National, and the district court stated that this default was sufficient justification for the termination, whether or not Interim-National may have had designs on the territory itself. Mem. Op. at 7. The district court acknowledged Williams's argument that the reason she could not pay her royalties was that her profits dwindled when the national franchisor began usurping her territory. The district court then stated that the franchisor's responsibility for causing the default was irrelevant. The court stated that this result followed from Original Great American, 970 F.2d at 279, in which we held it irrelevant that the franchisee's contract violations were the fault of the manager. A close reading of that case indicates that the "manager" we spoke of was an employee of the franchisee, and that the franchisor did nothing to hasten the franchisee's demise. So Original Great American does not apply to the present circumstance, where the franchisor has arguably forced the franchisee into default. In the present case, the record evidence interpreted in the light most favorable to Williams indicates that Interim-National lured away at least two of Williams's major clients by withholding account information from her. This seems the paradigmatic case of a contract party invoking a reasonable contract term (the discretionary obligation to furnish account leads) dishonestly to achieve a purpose "contrary to that for which the contract had been made." Id. at 280. Such manipulation, we have intimated, is the essence of bad faith. See id. A genuine issue of material fact exists regarding how much and why Interim-National withheld information, and thus summary judgment was inappropriate.

III.  Tortious Interference
with Prospective Economic Advantage

   Williams next contends that Interim-National tortiously interfered with her prospective economic advantage by taking "numerous business opportunities from national accounts, government and industry for itself, even though the patients were located inside the exclusive territory of [Interim-Evanston], and even though the Franchise Agreement required IHC to refer such business opportunities to IHC." Verified Amended Complaint at 7. In her complaint, Williams states she has specific knowledge about just one such incident, in which the national franchisor acted to exclude her from meetings with a client, and to sever the

flow of information about the client to Interim-Evanston. We gather from the complaint that the client, Cardiac Solutions, was already working with Interim-Evanston, because Williams alleges that the national company's interference prevented it from "serv[ing] Cardiac Solutions in a satisfactory manner." Id. at 7. Additionally, in her appellate brief, Williams alleges that both she and the Interim branch in the City of Chicago (Interim-Chicago) had contracts with the Illinois Department of Rehabilitative Services (DORS) in 1993. The city branch renewed its contract, and began serving patients in the Evanston area. At the same time, Williams failed to expand her business for DORS in her territory. It is unclear whether the existing DORS contract expired while Interim-Chicago was serving Evanston area patients covered by the DORS contract.

Under Illinois law, "the tort of interference with prospective economic advantage has four elements: (1) plaintiff must have a reasonable expectancy of a valid business relationship with a third party; (2) defendant must know of the prospective business relationship; (3) defendant must intentionally interfere with the prospective business relationship such that the prospective business relationship never materializes; and (4) the interference must damage the plaintiff." Lynch Ford, Inc. v. Ford Motor Co., 957 F. Supp. 142, 145-46 (N.D. Ill. 1997). The district court examined just the Cardiac Solutions relationship, as that was the only one detailed in the record at the time of the summary judgment motion. The court stated that while the first element was probably satisfied, Williams had not supplied sufficient evidence that Interim-National knew it had an account with Cardiac Solutions, or that it had purposely thrown a wrench into that relationship or damaged Interim-Evanston. Interim-Evanston does not challenge these conclusions per se. Instead, it says that the district court erred by focusing on Cardiac Solutions. See Appellant's Br. at 42-43. The court should have viewed the claim in light of all potential patients in the Evanston territory, it insists. If it had, then elements two, three and four would have been satisfied: Interim-National allegedly knew the Evanston branch had a right to all the patients in the territory; Interim-National allegedly interfered with Interim-Evanston's right to contract with them by swooping down first. And Interim-Evanston claims that according to an internal Interim-National survey completed in 1994, the Oak Park branch was treating more than one hundred clients in the Evanston territory, whose accounts were worth $30,000 to $60,000. Had Interim-Evanston received that money, it might have avoided its fatal

default. The problem with this alternate theory urged on us is that it fails to meet the first element of the tort. Interim-Evanston did not have a reasonable expectancy of a valid business relationship with all Interim patients in its territory. As explained above, Interim-National and its other franchisees were permitted to service Evanston clients so long as they did it from without their borders. So Interim-Evanston was not entitled to service every patient, and therefore it did not have a firm expectation of doing business with those patients that Interim-National eventually took on. The grant of summary judgment on this count was appropriate.

## IV. Accounting

Finally, Williams appeals the district court's grant of summary judgment on her request for an equitable accounting of the money still owed her by Interim-National. The district court reasoned that Interim-National was obliged to turn over some money to Interim-Evanston to reflect its use of the Interim-Evanston office for a period following the franchise termination. However, Interim-National also had the right to collect accounts receivable for Interim-Evanston, and since Interim-Evanston was delinquent in its royalty payments when the franchise was terminated, Interim-National was entitled to keep those funds. Despite the fact that Interim-Evanston is entitled to just a portion of the funds, we agree with the district court that the accounts are not sufficiently complicated to justify a separate claim for an equitable accounting. See, e.g., Zell v. Jacoby-Bender, Inc., 542 F.2d 34, 36 (7th Cir. 1976).

In sum, we affirm the district court's grant of summary judgment on the breach of contract, tortious interference and accounting claims. We reverse the district court's grant of summary judgment on the claim that Interim-National breached its duty of good faith and fair dealing, and remand for further proceedings consistent with this opinion.

/1 We will use "Williams" and "Interim-Evanston" interchangeably throughout this opinion.

/2 A 1985 amendment by which Williams's predecessor ceased operating a related franchise in temporary clerical services did not alter any of the terms relevant to us today.

/3 Williams also complains that Interim-National promised that when a client contracted to pay the national office, that office would forward

payment within five days. Williams contends
Interim-National delayed numerous payments for
weeks or months. But this "promise" is not
contained in the Franchise Agreement and is
documented nowhere in the record.