In the

# United States Court of Appeals
## For the Seventh Circuit

No. 00-3843

MICHAEL TATOM,

*Plaintiff-Appellant,*

*v.*

AMERITECH CORPORATION and
AMERITECH INFORMATION SYSTEMS, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 683—**Ronald A. Guzmán**, *Judge.*

ARGUED JUNE 7, 2001—DECIDED SEPTEMBER 18, 2002

Before COFFEY, EASTERBROOK, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* After announcing his early retirement from Ameritech Corporation ("Ameritech") in January 1997, Michael Tatom ("Tatom") accepted a job with U.S. West. Because Ameritech considered U.S. West to be one of its competitors, it informed Tatom that he would not be paid his annual incentive award for 1996. In addition, Ameritech decided to cancel the unvested stock options that the company had issued to Tatom pursuant to its Long Term Incentive Plan rather than to accelerate the vesting

of those options; it also cancelled Tatom's vested options as of the end of January 1997, leaving Tatom only a short window of time in which to exercise those options. Tatom subsequently filed this action claiming, *inter alia*, that Ameritech had breached its contractual obligations to him in withholding the 1996 incentive award and cancelling his stock options. In a thorough opinion, the district court granted summary judgment in favor of the defendants on these and the other claims that Tatom asserted. *Tatom v. Ameritech Corp.*, No. 99 C 683, 2000 WL 1648931 (N.D. Ill. Sept. 28, 2000) (Guzmán, J.). Tatom appeals that decision insofar as it disposed of his contractual arguments vis à vis his incentive award and stock options. We affirm.

## I.

By the time that Tatom announced his early retirement from Ameritech on January 16, 1997, he had worked for the company and its predecessors for more than twenty-five years and had risen to the post of Vice President for Operations in the Custom Business Services unit ("CBS") of Ameritech's wholly-owned subsidiary, Ameritech Information Systems ("AIS"). The CBS unit provided both regulated and nonregulated communications services for large businesses both within the United States and around the world. As CBS' Vice President for Operations, Tatom spearheaded the effort to review and streamline its services and managed to cut costs by twenty-five to thirty percent.

For 1996, the year prior to his departure from Ameritech, Tatom received two documents describing the components of his compensation for that year. These two documents form the basis for Tatom's claim that Ameritech was contractually obligated to pay him a bonus for 1996.

The first of these documents was a twenty-page statement entitled "Total Compensation: Your 1996 Total Com-

pensation Opportunity," which described all of the components of Tatom's anticipated compensation. R. 49, Tatom Dep. Ex. 6. As a senior executive, Tatom had been designated a "Corporate Resource" level employee, which status entitled him to a broader array of compensation than other managerial employees. The components of Tatom's compensation included his cash compensation (comprising a base salary plus an annual incentive award), long-term incentives (an annual award of stock options, with dividend equivalents), welfare benefits (health care plans and disability and dismemberment insurance), life insurance, and retirement benefits. The Total Compensation statement was customized to the extent that it was printed with Tatom's name on the cover page and contained specific information about his base salary, a target annual incentive payment, and the number of stock options granted to him. The statement indicated that Tatom's target bonus for 1996 was $50,500. A "Notes About Your Statement" section at the conclusion of this document stated, *inter alia*:

> Every effort has been made to ensure the accuracy of the information reported in this statement. However, errors can occur. In all cases, benefits that become payable to you will be made in accordance with the various plans and insurance contracts, which are always the governing documents.

R. 49, Tatom Dep. Ex. 6 at 18.

The second document that Tatom received was a nine-page brochure entitled "CBS Rewarding for Success," which provided an overview of the cash compensation program for CBS employees like Tatom. R. 49, Tatom Dep. Ex. 13. Included in that overview was a discussion of the formulas used to calculate an employee's base salary as well as his annual incentive (bonus) compensation. The final page of that brochure contained the following disclaimer:

**Notice**    Custom Business Services reserves the right to amend or cancel the CBS Compensation Program in whole or in part at any time without notice. It also reserves the right to reduce, modify, or withhold awards based on such factors as regulatory events, changes in business conditions, or individual performance.

CBS also reserves the right to decide all questions and issues arising under the CBS Compensation Program and its decisions are final.

The CBS Compensation Program is a statement of CBS' intentions and does not constitute a guarantee that any particular amount of compensation will be paid. It does not create a contractual relationship or any contractually enforceable rights between CBS and the employee.

R. 49, Tatom Dep. Ex. 13 at D139 (emphasis in original).

As we have mentioned, Tatom's compensation package included long-term incentives in the form of stock options, which Tatom received in 1992, 1994, 1995, and 1996. Each issue of stock options was governed by a stock option grant agreement that established a timetable for when the options vested (meaning that Tatom could then exercise the option to purchase a specified number of shares at a particular price). By the time Tatom left Ameritech's employ in 1997, he had accumulated options to purchase 19,750 shares of Ameritech stock. As of his resignation, 13,784 of those options had vested, while 5,966 of them (granted to him in 1995 and 1996) had not.

The stock option grant agreements each contained a provision providing for the accelerated vesting of an employee's options under certain circumstances. As relevant here, the agreements provided that the employee would

gain the immediate right to exercise any and all unvested options in the event of either the employee's normal retirement or, alternatively, his early retirement "with the Company's approval" after the year in which the options were issued. *See, e.g.*, R. 49, Tatom Dep. Ex. 26 at D273 ¶ 3, D275 ¶ 3.

The stock option grant agreements also provided for an extended period of time during which an employee could exercise vested options upon retirement. An employee would normally have only thirty days in which to exercise vested options upon separation from the company. However, as explained in a summary of Ameritech's Long Term Incentive Plan ("LTIP"):

> Upon normal retirement (age 65) or approved early retirement . . . [v]ested stock options generally remain exercisable until the earlier of five years from your retirement date or the original expiration date of the options.

R. 49, Tatom Dep. Ex. 8 at D176.

Ameritech's LTIP also included a forfeiture provision that came into play when a plan participant became employed with one of Ameritech's competitors:

> . . . Notwithstanding any other provision of the Plan, if a Participant, while otherwise eligible for payment or accrual of a benefit under the Plan:
>
> (a)  has, without the consent of the Company or any subsidiary, become associated with, is employed by, renders services to, or owns a substantial interest in any business that is competitive with the Company or its subsidiaries, . . .
>
> . . .

then, his participation in the Plan shall immediately cease and all undistributed awards and grants previously made to him under the Plan and all rights to payments of any kind under the Plan, exclusive of any amount voluntarily deferred shall be immediately forfeited.

R. 49, Tatom Dep. Ex. 7 at D186-87.

In the fall of 1996, Tatom entered into discussions with U.S. West about the possibility of employment with that company, which was undergoing a significant restructuring. On January 2, 1997, U.S. West formally offered Tatom a job as Vice President for Design Services of its Communications Group.

On January 16, 1997, Tatom announced his retirement from Ameritech and formally accepted U.S. West's offer of employment. Tatom did not disclose that he was departing for U.S. West, but at some point within the next five days, Ameritech learned that this was Tatom's intent. Walter Oliver was Ameritech's Senior Vice President for Human Resources, and as such had decision-making authority regarding benefits for Ameritech's executive employees. Oliver directed Andrea Cohen, Manager of Executive Compensation, to speak with someone in Ameritech's Corporate Strategy Department to determine whether U.S. West was considered one of the company's competitors, and also to secure legal advice from the company's in-house attorneys. Based on the results of those inquiries, Oliver determined that U.S. West was considered to be one of Ameritech's competitors.

On January 21, 1997, Oliver wrote Tatom a letter informing him that because he had accepted a job with U.S. West, Ameritech had decided to withhold his 1996 bonus, deny Tatom accelerated vesting of those stock options which had not yet become exercisable, and cancel his vested and unvested stock options:

In light of your resignation and subsequent employment by U.S. West, a competitor of Ameritech, we wish to advise you of the following implications of your decision:

. . .

2. No payment will be made with respect to the 1996 annual incentive award.

3. The terms of the stock option with dividend equivalents awards granted to you on 1/17/95 and 1/16/96 provide for accelerated vesting of non-vested shares in the event of normal retirement or early retirement with the Company's approval. . . . Although you are eligible for early retirement since your years of service plus age total more than 75, your early retirement is not approved by the Company for purposes of triggering accelerated vesting of stock options. Therefore, acceleration of unvested stock option shares will not occur and all stock options which have not vested as of January 31, 1997 will immediately be canceled.

4. Ameritech's Long Term Incentive Plans provide for the immediate cancellation of all outstanding awards, whether vested or unvested, if after separation of employment, you are employed by or render services to any company that competes with the business of Ameritech or any of its subsidiaries. Therefore, all vested stock options will be canceled as of the close of business on January 31, 1997.

R. 49, Tatom Dep. Ex. 3 at D2. After receiving this letter, Tatom spoke with Oliver by telephone and protested the decision to deny him the 1996 bonus and to cancel his stock options, but Oliver reaffirmed the company's decision.

Tatom's last day of employment with Ameritech was January 31, 1997. True to Oliver's letter, the company did

not pay him the bonus and canceled his vested and un-vested options. Before his vested options were cancelled on January 31, Tatom did elect to exercise his rights with respect to the purchase of at least 1,000 shares of Ameritech stock.

Based on diversity of citizenship (Tatom moved to Colorado when he accepted employment with U.S. West), federal question, and pendent claim jurisdiction, Tatom filed suit against Ameritech and AIS asserting claims for breach of contract, violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA"), and violations of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1132(a)(1)(b), 1140 ("ERISA"). After engaging in discovery, the parties filed cross-motions for summary judgment. Finding there to be no dispute of material fact, the district court entered judgment against Tatom and in favor of the defendants on each of Tatom's claims. 2000 WL 1648931. With respect to Tatom's claims for breach of contract, which are the only claims at issue in this appeal, the district court reasoned as follows:

First, regarding Tatom's 1996 bonus, the court determined that no reasonable jury could find that Ameritech had promised in sufficiently clear terms to pay him such a bonus. In making that determination, the court relied in particular on the disclaimer in the CBS Compensation Program brochure, which indicated that the program was simply a statement of the CBS unit's intentions and not an enforceable contract. 2000 WL 1648931, at *5.

As for the stock options, the court noted that the option grant agreements conditioned accelerated vesting of un-vested options upon the company's approval of a participant's early retirement, and that the LTIP provided for forfeiture of the participant's options upon his employment with a competitor of Ameritech—a qualification also noted in the explanatory brochure. *Id.* at *5 - *6.

The court rejected Tatom's contention that the forfeiture provision constituted an unreasonable anti-competition clause. Because the provision restricted Tatom's participation in a profit-sharing plan rather than his employment rights, the court reasoned, it was not unreasonable and could be enforced. *Id.* at *6.

Next, the court found it to be undisputed that U.S. West competed with Ameritech's business: the manager of Ameritech's Corporate Strategy department had testified that he had been tracking U.S. West since it invested in a subsidiary of Time Warner, which provided nonregulated telephone services to large businesses within the Ameritech region; and Ameritech's Regional Vice President for Voice and Data Managed Services had averred that Ameritech's CBS unit had unsuccessfully bid against U.S. West to provide nonregulated service to Motorola in Arizona, a state in U.S. West's region. *Id.* at *7.

Finally, the court rejected Tatom's contention that Ameritech had acted inconsistently and in violation of an implied covenant of good faith and fair dealing by allowing two other former employees who went to work for U.S. West to exercise their vested options within five years of their departure from Ameritech. The evidence revealed that Ameritech was unaware that those employees had accepted employment with U.S. West, and in any event, Ameritech had grounds to treat Tatom differently: Tatom was a higher level executive than either of the other two employees, and "logic dictates that a [company's] heightened reliance on top executives to manage all aspects of its business is accompanied by increased susceptibility should one of these executives leave to work for one of its competitors." *Id.* at *8.

**II.**

Tatom does not quarrel with the disposition of his claims under either the IWPCA or ERISA in the district court. His appeal is limited to his contractual claims vis à vis his 1996 bonus and his stock options. We take those claims in turn.

A. Incentive Award

Tatom contends that the CBS Compensation Program brochure, together with his 1996 Total Compensation statement, established a contract pursuant to which Ameritech was obligated to pay him a bonus. Ameritech breached that obligation, in Tatom's view, when it denied him a bonus based solely on his decision in 1997 to leave the company and go to work for U.S. West.

Under Illinois law, which the parties agree governs Tatom's contract claims, an employee handbook or other statement of employment policy akin to the documents at issue here can give rise to an enforceable contract provided three conditions are met: (1) the language of the statement sets forth a promise in terms clear enough to cause a reasonable employee to believe that an offer has been made; (2) the statement is distributed to the employee, so that the employee is aware of its contents and reasonably construes it to be an offer; and (3) the employee accepts the offer by commencing or continuing to work after reading the statement. *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987). "When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement and under traditional principles a valid contract is formed." *Id.*; *see also Doyle v. Holy Cross Hosp.*, 708 N.E.2d 1140, 1144 (Ill. 1999). The threshold and dispositive question here is whether the two documents regarding Tatom's compensation set forth a promise in terms clear enough to

cause an employee to reasonably believe that an offer of a bonus had been made. We agree with the district court that they did not.

Read together, the Total Compensation statement and the CBS Compensation Program brochure do not reasonably establish a promise to pay him a bonus. True, the Total Compensation statement does indicate that his compensation would consist of both a base salary plus an annual incentive award. That statement also identifies a target bonus amount of $50,500, which "will be made available for payout if key financial performance targets are achieved." R. 49, Tatom Dep. Ex. 6 at 2. It also indicates that the bonus could be more or less than the target amount "depending on Corporate and business unit financial results, as well as [Tatom's] individual performance." *Id.* So Tatom could not reasonably have believed that he was promised payment of the target bonus amount. What dooms a reasonable expectation that a bonus in *any* amount would be paid is the "Notice" at the end of the nine-page CBS Compensation booklet. That notice states that Ameritech's CBS unit "reserves the right to reduce, modify, or withhold awards based on such factors as regulatory events, changes in business conditions, or individual performance," as well as the final right "to decide all questions and issues arising under the CBS Compensation Program . . . ." More to the point, the notice expressly disavows any notion that a bonus had been promised:

> The CBS Compensation Program is a statement of CBS' intentions and does not constitute a guarantee that any particular amount of compensation will be paid. It does not create a contractual relationship or any contractually enforceable rights between CBS and the employee.

R. 49, Tatom Dep. Ex. 13 at D139.

This express disclaimer forecloses any reasonable expectation that Tatom had been promised a bonus. *See, e.g.*, *Garcia v. Kankakee Housing Auth.*, 279 F.3d 532, 535-36 (7th Cir. 2002); *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 17 (7th Cir. 1999); *Moore v. Ill. Bell Tel. Co.*, 508 N.E.2d 519, 521 (Ill. App. 1987). The language of the disclaimer is clear. Tatom points out that the Total Compensation statement does not itself contain such a disclaimer, but the "Notes About Your Statement" section of that statement does state that "[i]n all cases, benefits that become payable to you will be made in accordance with the terms of the various plans and insurance contracts, which are always the governing documents" (R. 49, Tatom Dep. Ex. 6 at 18); and even Tatom agrees that the Total Compensation statement must be read together with the CBS Compensation Program booklet, which of course does include the disclaimer (*see* Tatom Br. 5). Tatom also suggests that the disclaimer is not sufficiently conspicuous, although he does not contend that he never saw the notice. *Compare Wheeler v. Phoenix Co. of Chicago*, 658 N.E.2d 532, 536 (Ill. App. 1995) (drawing on law of warranty for requirement that disclaimer in employee contract must be conspicuous), *with Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 772 F.2d 1329, 1335 (7th Cir. 1985) (observing that under law of warranty, buyer's actual knowledge of warranty disclaimer obviates any need to determine whether disclaimer is conspicuous). The disclaimer was by no means hidden: it came at the end of a short booklet, was set forth in the same typeface as the rest of the booklet following the word "Notice" in bold letters (a heading and typeface that alerted the reader to its significance), and the language of the disclaimer was unambiguous. *See, e.g., Border v. City of Crystal Lake*, 75 F.3d 270, 274-75 (7th Cir. 1996).

Because the language of the relevant documents did not give rise to a reasonable belief that Tatom would receive a

bonus, Tatom's contractual claim necessarily fails. We need not consider, therefore, whether Ameritech acted improperly by withholding the bonus based on Tatom's decision to leave Ameritech for a competitor.

B.   Stock Options

Had all gone as Tatom had hoped with his retirement, he would have enjoyed two key rights with respect to his stock options: accelerated vesting of all unvested options, and the right to exercise all vested options within five years from the date of his retirement or prior to the original expiration date of the options, whichever came first. However, based on the forfeiture provisions of the LTIP regarding subsequent employment with competitors of Ameritech, Ameritech cancelled Tatom's unvested options altogether and forced him to exercise his vested options by the end of January 1997 or lose them. Tatom challenges Ameritech's treatment of the stock options on three grounds. First, he contends that the forfeiture provisions of the LTIP are unenforceable because they impose an unreasonable, anti-competitive restraint on his ability to obtain subsequent employment. Second, he believes that the evidence does not establish that U.S. West was in fact Ameritech's competitor. Third, he believes that Ameritech's disparate treatment of other former employees who went to work for U.S. West establishes a violation of the implied covenant of good faith and fair dealing.

As Tatom points out, Illinois disfavors noncompete provisions in employee contracts. *Advent Elecs., Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997). This is not a case that involves a facially anti-competitive provision; nothing in the agreements at issue actually restricted Tatom's ability to work for Ameritech's competitors. Federal cases draw a distinction between provisions that prevent an

employee from working for a competitor and those that call for a forfeiture of certain benefits should he do so. *E.g.*, *Clark v. Lauren Young Tire Ctr. Profit Sharing Trust*, 816 F.2d 480, 482 n.1 (9th Cir. 1987); *Cinelli v. American Home Prods. Corp.*, 785 F.2d 264, 266 (10th Cir. 1986); *Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 844-46 (5th Cir. 1975); *see also Schlumberger Tech. Corp. v. Blaker*, 859 F.2d 512, 516 (7th Cir. 1988) (summarizing differing state approaches to this issue). However, *Johnson v. Country Life Ins. Co.*, 300 N.E.2d 11, 14-15 (Ill. App. 1973), dealt with such a forfeiture provision and deemed it the equivalent of an unenforceable anti-competitive clause. That provision caused an insurance agent to lose the commissions on the life insurance policies he had sold if he represented any other insurer in the region. By thus depriving the agent of his compensation, the forfeiture provision had a direct and inescapable effect on his livelihood. *Id.* at 15. In *Sarnoff v. American Home Prods. Corp.*, 798 F.2d 1075, 1080-81 (7th Cir. 1986), we acknowledged the possibility that an Illinois court might likewise "pierce the formal wrappings" of a stock option forfeiture provision and deem it the equivalent of an anti-competitive provision. We also acknowledged the alternative possibility that Illinois courts might distinguish between the forfeiture of a "bonus" like a stock option and "regular compensation" like wages and the commissions at issue in *Johnson*. *Id.* at 1081. Ultimately, we did not have to decide in *Sarnoff* how such a forfeiture provision should be treated under Illinois law, nor need we do so here.

An anti-competitive clause, if that is what the forfeiture provision here is, may still be enforced in Illinois as long as it is reasonable. *E.g.*, *Advent Elecs.*, 112 F.3d at 274, quoting *Rao v. Rao*, 718 F.2d 219, 223 (7th Cir. 1983). A provision that calls for the forfeiture of a bonus in the form of stock options does not strike us as an unreasonable restraint on competition. Stock options, in contrast to other

types of regular and bonus compensation, give an employee the right to acquire an ownership interest in a company; that interest in turn gives the employee a long-term stake in the company and supplies him an incentive to contribute to the company's performance. *See Rosenberg v. Salomon, Inc.*, 992 F. Supp. 513, 518 (D. Conn. 1997). A provision calling for the forfeiture of such options in the event that the holder goes to work for a competitor thus serves to keep the option holder's interests aligned with the company's. In this respect, the LTIP's forfeiture provision is not unreasonable.

Based on the record before us, we also find that Ameritech was within its rights to deem U.S. West a competitor and thus to invoke the forfeiture provision. To cite but a few examples of competition disclosed in the record: (1) In 1995, Ameritech's CBS unit (of which Tatom was then Vice President for Operations) had made a bid to provide certain nonregulated communications services, including voice and data services, to Motorola in Arizona but lost out to U.S. West (R. 48, Mulchrone Aff. ¶¶ 8-9); (2) also in 1995, Time Warner, of which U.S. West was a part-owner, won certification to provide local telephone service in Chicago (R. 48, Weller Dep. at 92); and (3) in 1996, U.S. West, in partnership with PCS Prime Co, was providing cellular service in Chicago, among other localities (R. 48, Woodward Aff. Ex. B, U.S. West Media Group 1996 Summary Annual Report at 8). This evidence suggests that Ameritech had ample ground on which to treat U.S. West as one of its competitors. Indeed, Tatom has identified nothing in the record that calls that assessment into doubt, beyond arguing that the evidence is insufficient to show that the two companies were repeatedly bidding head to head to serve the same customers and seizing business from one another, which we believe to be an unrealistically narrow understanding of the concept of competition.

Finally, although Ameritech did not require two other employees to forfeit their LTIP benefits when they left the company to work with U.S. West, this does not present a question as to whether Ameritech violated the covenant of good faith and fair dealing that Illinois law reads into all contracts absent express disavowal. *E.g.*, *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000). The record reveals that (1) Ameritech was unaware that the other employees had taken jobs with U.S. West when they left Ameritech's employ (R. 48, Oliver Dep. at 211; *id.*, Cohen Dep at 101); (2) Tatom was a higher level executive with broader responsibilities than either of the other two employees (*see*, *e.g.*, R. 48, Tatom Dep. at 56); and (3) Tatom's status was reflected by the fact that he was one of approximately 225 of Ameritech's 24,719 management employees who participated in the company's Corporate Resources program (R. 48, Young Aff. ¶¶ 4-5), which gave him access to a wider array of benefits than the other two employees, including Ameritech's Key Management Life Insurance Plan (pursuant to which the company and the participant shared the cost of insurance on the participant's life), additional disability and pension plan benefits, and higher stock option grant levels (*id.* ¶ 6). The company thus had a plausible basis on which to treat Tatom differently than it did other departing employees. Moreover, the record gives no indication that Ameritech acted precipitously or arbitrarily in deciding to forfeit Tatom's stock options: Oliver, who was charged with that decision, initiated consultations with the company's Legal and Corporate Strategy departments, ascertained that the company did, in fact, view U.S. West as one of its competitors, and invoked the forfeiture clause on that basis. *See* R. 48, Oliver Dep. 82-84, 88-89. There is no evidence in the record suggesting that Ameritech made that decision on any other basis, let alone an improper one.

### III.

For all of these reasons, we AFFIRM the district court's decision to grant summary judgment in favor of the defendants on Tatom's contractual claims.


A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*