### In re CLARK RETAIL ENTERPRISES, INC., Clark Retail Group, Inc., Debtors.

**Super Stop Petroleum, Inc., Plaintiff,**

**v.**

**Clark Retail Enterprises, Inc., National Real Estate Clearinghouse, Inc., GE Capital Franchise Finance Corporation, and Shell Capital Inc., Defendants.**

**Bankruptcy Nos. 02 B 40045, 02 B 40046.
Adversary No. 03 A 04393.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 29, 2004.

Kimberly J. Robinson, Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg, LLC, Chicago, IL, Attorney for Plaintiff.

Nathan A. Schultz, Stutman, Treister & Glatt, P.C., Los Angeles, CA, for Clark Retail Enterprises, Inc.

Michael C. Rupe, Jenner & Block, Chicago, IL, for GE Capital Franchise Finance Corporation.

Rudy A. Figueroa, Daley & Mohan, P.C., Chicago, IL, for National Real Estate Clearinghouse, Inc.

John F. Pollock, McGuire, Woods, Ross & Hardies, Chicago, IL, for Shell Capital, Inc.

## *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

These matters come before the Court on the cross-motions of Plaintiff Super Stop Petroleum, Inc. ("Super Stop") and Defendants Clark Retail Enterprises, Inc. ("Clark") and National Real Estate Clearinghouse, Inc. ("NRC") for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 on the complaint filed by Super Stop seeking turnover of deposits it paid on certain retail units for which Super Stop made bids that were not accepted by Clark.[1] For the reasons stated herein, the Court finds as a matter of law that NRC's reallocation, for Clark's benefit, of Super Stop's initial deposits for the bids for retail units that were not accepted to meet the additional earnest money requirement for units for which

Super Stop's bids were accepted was invalid under the controlling contractual documents. The Court further finds that Clark's damages are limited to the initial deposits actually made by Super Stop for the retail units for which its bids were accepted. Accordingly, the Court grants Super Stop's motion for summary judgment, denies Clark and NRC's cross-motion, and directs Clark or NRC, its agent, to return to Super Stop the subject deposits that aggregate $499,200.00 on retail units for which Super Stop made bids that were not accepted.

## I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. They are core proceedings under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. *APPLICABLE STANDARDS*

In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) reads in part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

---

1. Super Stop's complaint, filed on October 22, 2003, named Clark and NRC as defendants. Subsequently, the Court entered orders granting the motions of both GE Capital Franchise Finance Corporation ("GECC") and Shell Capital Inc. ("Shell") to intervene in the adversary proceeding. GECC and Shell are mortgage holders for several of the stores at issue in this matter. Super Stop 7056–1 statement at ¶¶ 21, 22, and Exs. H and I. Only NRC joined in Clark's cross-motion for summary judgment, the subject of the instant Opinion.

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). *See also Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1019 (7th Cir.2003).

The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir.1990); *Farries v. Stanadyne/Chi. Div.*, 832 F.2d 374, 378 (7th Cir.1987) (*quoting Wainwright Bank & Trust Co. v. Railroadmens Fed. Savs. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986)). Where the material facts are not in dispute, the sole issue is whether the moving party is entitled to a judgment as a matter of law. *ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir.1998) (citation omitted). On a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003) (internal quotation omitted).

In 1986, the United States Supreme Court decided a trilogy of cases which encourages the use of summary judgment as a means to dispose of factually unsupported claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to show that no genuine issue of material fact is in dispute. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. 1348.

All reasonable inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (citation omitted). The existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir.1994) (citation omitted). "[S]ummary judgment is not an appropriate occasion for weighing the evidence; rather, the inquiry is limited to determining if there is a genuine issue for trial." *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir.1990) (citation omitted). The Seventh Circuit has noted that trial courts must remain sensitive to fact issues where they are actually demonstrated to warrant denial of summary judgment. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065–66 (7th Cir.2000); *Szymanski v. Rite–Way Lawn Maint. Co., Inc.*, 231 F.3d 360, 364 (7th Cir.2000).

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings; rather, its response must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Matsushita*, 475 U.S. at 587, 106 S.Ct.

1348; *Patrick v. Jasper County,* 901 F.2d 561, 565 (7th Cir.1990) (citations omitted). The manner in which this showing can be made depends upon which party will bear the burden of persuasion at trial. If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production either by submitting affirmative evidence that negates an essential element of the non-moving party's claim or by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim. *See Union Nat'l Bank of Marseilles v. Leigh (In re Leigh),* 165 B.R. 203, 213 (Bankr.N.D.Ill. 1993) (citation omitted).

■ The parties have filed cross-motions for summary judgment. Each motion must be ruled on independently and must be denied if there are genuine issues of material fact. *ITT Indus. Credit Co. v. D.S. Am., Inc.,* 674 F.Supp. 1330, 1331 (N.D.Ill.1987). Cross-motions for summary judgment do not require the Court to decide the case on the motions; the Court can deny both motions if both parties have failed to meet the burden of establishing that no genuine issues of material fact exist and that they are entitled to judgment as a matter of law. *Id.; Pettibone Corp. v. Ramirez (In re Pettibone Corp.),* 90 B.R. 918, 922 (Bankr.N.D.Ill. 1988) (citations omitted). Thus, on their respective motions, Super Stop and Clark each bear the burden of demonstrating the absence of material factual issues and establishing that judgment should be entered in its favor as a matter of law. *See Lindemann v. Mobil Oil Corp.,* 141 F.3d 290, 294 (7th Cir.1998). "All inferences are construed in favor of the party against whom the motion under consideration is made." *Solow v. United States (In re Johnson Rehab. Nursing Home, Inc.),* 239

B.R. 168, 172 (Bankr.N.D.Ill.1999) *(citing Andersen v. Chrysler Corp.,* 99 F.3d 846, 856 (7th Cir.1996)).

■ Summary judgment is particularly appropriate in cases involving the interpretation of contractual documents. *United States v. 4500 Audek Model No. 5601 AM/FM Clock Radios,* 220 F.3d 539, 543 (7th Cir.2000) (citations omitted); *Anstett v. Eagle–Picher Indus., Inc.,* 203 F.3d 501, 503 (7th Cir.2000) (citation omitted); *Ryan v. Chromalloy Am. Corp.,* 877 F.2d 598, 602 (7th Cir.1989) (citation omitted). "[S]ummary judgment should be entered only if the pertinent provisions of the contractual documents are unambiguous; it is the lack of ambiguity within the express terms of the contract that forecloses any genuine issues of material fact." *Ryan,* 877 F.2d at 602 (citation omitted). Construing the language of a contract is a question of law appropriate for summary judgment, unless the contract is ambiguous. *Reaver v. Rubloff–Sterling, L.P.,* 303 Ill.App.3d 578, 236 Ill.Dec. 973, 708 N.E.2d 559, 561, *appeal denied,* 184 Ill.2d 573, 239 Ill.Dec. 614, 714 N.E.2d 533 (1999) (citation omitted); *Ford v. Dovenmuehle Mortgage, Inc.,* 273 Ill.App.3d 240, 209 Ill.Dec. 573, 651 N.E.2d 751, 754 (1995) (citations omitted). These points are pertinent to the motions at bar because the parties entered into a contractual agreement under which Clark contends that it was authorized to reallocate Super Stop's initial deposits for the bids for properties that were not accepted to meet the additional earnest money requirement for those units for which Super Stop's bids were accepted.

Local Bankruptcy Rule 7056–1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Illinois, which deals with summary judgment motions, was modeled after LR56.1 of the Local Rules of the United States District Court for the Northern

District of Illinois. Hence, the case law construing LR56.1 and its predecessor Local Rule 12 applies to Local Bankruptcy Rule 7056–1.

Pursuant to Local Bankruptcy Rule 7056, a motion for summary judgment imposes special procedural burdens on the parties. Specifically, the Rule requires the moving party to supplement its motion and supporting memorandum with a statement of undisputed material facts ("7056–1 statement"). The 7056–1 statement "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." Local Bankr.R. 7056–1B.

Super Stop filed a 7056–1 statement that fully complies with the Rule. It includes numbered paragraphs establishing undisputed facts with specific references to accompanying exhibits, as well as the affidavit of Matthew J. Militzok ("Militzok"). Militzok is an authorized representative of Super Stop. Militzok Aff. at ¶ 1. He has personal knowledge about the auction of Clark's properties at issue, the bids submitted by Super Stop, and the correspondence subsequently exchanged by the parties. *See id.* at ¶¶ 1–17.

Specifically, Militzok states that in June 2003, NRC, acting as Clark's agent, contacted Super Stop about various gasoline station/convenience store retail units that were available from Clark for sale or assignment. *Id.* at ¶ 2. According to Militzok, Super Stop requested and received sales material on several of the units and subsequently submitted to NRC a signed "Bid Offer Form and Purchase and Sale Agreement" for 81 of the stores. *Id.* at

¶¶ 3, 4, and 6. He avers that, contemporaneous with the submission of the PSA, Super Stop made a total initial deposit of $900,000.00, representing the greater of $10,000.00 or 2.5 percent of the amount bid for each unit. *Id.* at ¶¶ 5 and 6.

Militzok asserts that in mid-July 2003, Clark accepted Super Stop's bid for 18 of the retail units; subsequently, the parties agreed that Clark could revoke its acceptance of Super Stop's bids on two of these units. *Id.* at ¶ 7. He further states that Super Stop was required to increase its initial deposit to 10 percent of the bid price of each unit within two days after acceptance of its bid in order to proceed with the purchase of the 16 stores. *Id.* at ¶ 8. According to Militzok, NRC notified Super Stop, in separate letters dated either July 16, 2003 or July 21, 2003, that Clark had accepted Super Stop's bids on the particular units and asked Super Stop whether NRC should apply the initial deposits made on rejected bids to satisfy the additional earnest money obligation. *Id.* at ¶¶ 9 and 10.

Militzok claims that Super Stop sent to NRC, via facsimile, a written request for the return of the initial deposits on the rejected bids in letters dated July 28, 2003 and August 5, 2003. *Id.* at ¶¶ 11, 12, and 14. He admits that Super Stop did not proceed to closing on the 16 stores and that it therefore forfeited its initial bid deposit totaling $230,000.00 for those units pursuant to the liquidated damages clause of the PSA. *Id.* at ¶¶ 13 and 16. Finally, Militzok asserts that although NRC has returned $170,800.00 of the initial deposits made by Super Stop on the rejected bids, NRC has refused to give back the remaining $499,200.00, claiming that it reallocated those funds to satisfy the additional earnest money requirement of 10 percent of

the bid price.[2] *Id.* at ¶¶ 15 and 17.

Clark also filed a 7056–1 statement in complete compliance with the Rule. It consists of numbered paragraphs demonstrating uncontested facts with specific references to accompanying exhibits, as well as the affidavits of Joseph Sullivan ("Sullivan") and Evan Gladstone ("Gladstone"). Sullivan is secretary and former general counsel for Clark. Sullivan Aff. at ¶ 2. Gladstone is executive managing director of NRC. Gladstone Aff. at ¶ 2. Both have personal knowledge of the matters to which they attest. Sullivan Aff. at ¶¶ 1 and 2; Gladstone Aff. at ¶¶ 1 and 2.

Sullivan states that Clark operated approximately 800 gasoline stations and convenience stores as of October 15, 2002, the Chapter 11 petition date. Sullivan Aff. at ¶¶ 3 and 4. He avers that Clark was authorized to employ and retain NRC to conduct an auction to sell these properties pursuant to the Court's order entered on May 22, 2003. *Id.* at ¶ 5. Finally, Sullivan notes that a copy of the Court's order establishing marketing procedures for the auction, approving bidding procedures, scheduling sale hearings, and "granting related relief" is appended as Exhibit A to his affidavit. *Id.* at ¶ 6.

Gladstone asserts that NRC conducted an auction of the properties owned and leased by Clark and that, subsequently, Clark, NRC, and the applicable mortgage holders decided which bids to accept. Gladstone Aff. at ¶¶ 3 and 4. He agrees that Super Stop submitted a multiple bid for 81 properties and concurrently paid NRC an initial deposit of $900,000.00. *Id.* at ¶¶ 5 and 6. He further concurs that NRC, on behalf of Clark and its mortgagees, accepted 18 of Super Stop's bids, via faxed acceptance letters, and rejected its bids on the remaining 63 properties. *Id.* at ¶¶ 7 and 8. Gladstone also acknowledges that the parties mutually agreed at later dates that two of the 18 stores would not be awarded to Super Stop. *Id.* at ¶ 9.

According to Gladstone, Super Stop neither timely contacted NRC to request the return of the initial deposits on the unawarded stores nor separately deposited with NRC the additional earnest money required for the 16 properties by July 18, 2003 and July 23, 2003, the deadlines for the deposit of the additional payment. *Id.* at ¶ 10. Gladstone states that NRC therefore applied the initial deposits for the bids on the unawarded units on those two dates in order to satisfy the additional deposit requirement for the awarded units. *Id.* at ¶ 11. He avers that on July 28, 2003, NRC received via facsimile a letter from Super Stop demanding return of $670,000.00 in deposits for the unaccepted bids and claiming that it would send the additional earnest money by separate check for the 16 awarded stores. *Id.* at ¶ 12 and Ex. D. Gladstone further states that Super Stop never remitted the additional money and that, accordingly, NRC declared in writing that Super Stop had defaulted on all 16 stores for which its bids were accepted. *Id.* at ¶¶ 14 and 16. Finally, he asserts that in early September 2003, NRC refunded to Super Stop $170,800.00, representing the initial deposits for unaccepted bids that had not been reallocated to meet the additional earnest money requirement for the 16 awarded stores. *Id.* at ¶ 17.

The party opposing a summary judgment motion is required by Local Rule 7056–2 to respond ("7056–2 statement") to the movant's 7056–1 statement, paragraph

---

**2.** The parties do not dispute the amount of money at issue in this matter. The Court presumes that in copying paragraph 20 of Super Stop's 7056–1 statement in order to respond to it, Clark's reference to $490,200.00 still held by NRC is simply a typographical and proofreading error. *See* Clark 7056–2 statement at ¶ 20.

by paragraph, and to set forth any material facts that would require denial of summary judgment, specifically referring to the record for support of each denial of fact. Local Bankr.R. 7056–2. The opposing party is required to respond "to each numbered paragraph in the moving party's statement" and to make "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Bankr.R. 7056–2A(2)(a). Most importantly, "[a]ll material facts set forth in the [7056–1] statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Local Bankr.R. 7056–2B.

Clark has wholly complied with this Rule. It has responded to Super Stop's statement paragraph by paragraph, making specific references to supporting materials relied upon as required under the Rule. Super Stop has followed the Rule in substance, but has deviated from the specific procedural directives set forth in the Rule. Although Super Stop's response contains numbered items corresponding to each paragraph in Clark's 7056–1 statement, 19 of the 27 entries consist merely of the single sentence "Super Stop does not dispute the facts set forth in Paragraph [ ] of the Statement." Most of the remaining entries dispute merely the characterization of some of the facts in Clark's 7056–1 statement, and few include specific references to any part of the record or to any supporting materials relied upon to bolster the facts set forth.

### III. UNDISPUTED FACTS AND BACKGROUND

The parties do not dispute any of the material facts in this matter. On October 15, 2002, Clark filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code").[3] Super Stop 7056–1 statement at ¶ 1 and Ex. A. At the time, Clark operated about 800 gasoline stations and convenience stores situated on properties either owned or leased by Clark or its subsidiaries. Clark 7056–1 statement at ¶ 4. On May 22, 2003, the Court entered an order authorizing Clark to employ and retain NRC to conduct a single sealed-bid auction for the sale of all of Clark's properties. May 22, 2003 Order; Sullivan Aff. at ¶ 5. Subsequently, on June 10, 2003, the Court established marketing procedures ("Auction Procedures") to govern the auction and approved, in their entirety, both the bidding procedures ("Bidding Procedures") and the purchase and sale agreement ("PSA") to be used in connection with the auction. Sullivan Aff. at ¶ 6 and June 10, 2003 Order appended as Ex. A; *see also* Gladstone Aff. at Ex. A.

Shortly thereafter, NRC contacted Super Stop regarding the various Clark properties that were for sale or assignment. Super Stop 7056–1 statement at ¶ 3; Militzok Aff. at ¶ 2. Super Stop is a Florida-based corporation that operates combined gasoline stations and convenience stores similar to those run by Clark. Compl. at ¶¶ 5 and 7. On July 8, 2003, Super Stop submitted a "multiple bid" for 81 of the Clark properties, along with an initial bid deposit of $900,000.00. Clark 7056–1 statement at ¶¶ 12 and 13. This sum represented the greater of $10,000.00 or 2.5 percent of the bid amount for each store, as required under both the Bidding Procedures and the PSA. Bidding Procedures at p. 5; PSA at ¶ 2(a); Militzok Aff. at ¶¶ 5 and 6.

---

**3.** More precisely, Clark Retail Enterprises, Inc. and Clark Retail Group, Inc. each filed a voluntary petition for reorganization under Chapter 11. Super Stop 7056–1 statement at ¶ 1 and Ex. A. The cases were consolidated and are being jointly administered pursuant to Court order entered on October 15, 2002.

In mid-July, Clark, NRC, and the applicable mortgage holders accepted Super Stop's bids for 18 stores. Super Stop 7056–1 statement at ¶ 8; Militzok Aff. at ¶ 7. The parties later mutually agreed that two of the stores would not be awarded to Super Stop, resulting in 16 units for which Super Stop had made an accepted bid. *Id.;* Clark 7056–1 statement at ¶ 16. In order to move forward with the purchase of these stores, Super Stop was required to increase its initial deposit to 10 percent of the bid price within two days after being notified that its bids had been accepted. Bidding Procedures at pp. 5 and 6; PSA at ¶ 2(b).

The acceptance of Super Stop's bids was memorialized by NRC in a series of separate letters, one for each unit awarded, sent via facsimile and dated either July 16, 2003 or July 21, 2003. Militzok Aff. at Ex. D. Each letter contained the following text under the subhead "Additional Deposit":

We are currently holding sufficient funds for your ten percent (10%) Earnest Money deposit, or $10,000, whichever is greater. If you have sent us additional deposits for other sites not yet awarded or awarded to other bidders and would like those monies returned and not applied to your close of escrow, please fax us a letter . . . requesting a refund.

*Id.* As of July 18, 2003 and July 23, 2003, two days after the written acceptance of its bids, Super Stop had not paid the additional earnest money required to bring its initial deposit up to 10 percent of the bid price, nor had it requested a refund at that time. Clark 7056–1 statement at ¶ 18. Thus, NRC applied the initial deposits for the stores not awarded to Super Stop to the additional earnest money requirement for the 16 stores that it had been awarded. *Id.* at ¶ 19.

Several days later, however, on July 28, 2003, Super Stop requested in writing, via facsimile, the return of the initial deposits for the units for which its bids had not been accepted. Militzok Aff. at Ex. E. The letter read, in pertinent part, as follows:

I am writing to request the immediate return of all deposits on stores that have not been awarded to Super Stop Petroleum, Inc. for the Clark sale.

*We do not want to have initial deposits on un-awarded stores applied to any additional deposit on stores we have been awarded.* We will increase our bid deposits from the 2.5% to 10% on the stores that have already been awarded to us with a separate check that we will send to your offices.

*Id.* (emphasis in original). Super Stop sent, via facsimile, a second written request for return of the money on August 5, 2003. *Id.* at Ex. F.

Subsequent to Super Stop's first request, the Court, by separate orders dated July 30, July 31, and August 1, 2003, approved the sale of each of the 16 units awarded to Super Stop. Clark 7056–1 statement at ¶ 23. Orders approving the sales of the 65 stores not awarded to Super Stop were entered over the period of approximately one month, from July 30, 2003 through August 26, 2003. Super Stop 7056–2 statement, additional facts at ¶ 2.

On August 7, 2003, Super Stop provided written notification, via facsimile, to the title insurance company that was managing the Clark property closings that it would be defaulting on six of the 16 stores and that it was forfeiting the initial deposit for these six units. Clark 7056–1 statement at ¶ 24; Gladstone Aff. at Ex. F. On August 20, 2003, NRC sent Super Stop a series of letters, declaring Super Stop in default on all of the 16 stores. Clark 7056–1 statement at ¶ 25. Each letter

referenced one particular unit and noted that Super Stop's "bid deposit" for that store would not be returned pursuant to the Bidding Procedures. Gladstone Aff. at Ex. G. In early September 2003, NRC provided Super Stop with a refund of $170,800.00, the amount by which the total initial bid deposit exceeded the additional earnest money required for the 16 properties. *Id.* at ¶ 17.

On October 22, 2003, Super Stop filed a complaint, seeking turnover of $499,200.00, which represented the deposits paid on stores for which Super Stop did not make an accepted bid.[4] Subsequently, on November 21, 2003, Clark and NRC filed answers, both asserting four affirmative defenses.[5] About two months later, on January 30, 2004, Super Stop and Clark filed the instant cross-motions for summary judgment. In short, Super Stop contends that NRC unilaterally applied the initial bid deposits for the stores not awarded to Super Stop to the additional earnest money requirement for the 16 awarded units without Super Stop's consent and without authority under the

controlling contractual documents. Accordingly, Super Stop claims that the reallocation was invalid and that it is entitled to the return of those funds. In response, both Clark and NRC allege that application of the funds to satisfy the additional earnest money requirement was valid under the contractual documents, that Super Stop is bound by the liquidated damages clause of the PSA, and that, pursuant to that clause, Super Stop's failure to proceed to closing resulted in the forfeiture of the entire earnest money amount.[6] The crux of the dispute emanates from the fact that the contractual documents are silent as to what happens if a successful bidder makes the initial deposit with its bid, but fails to make the subsequent deposit of the additional earnest money required under paragraph 2(b) of the PSA.

## IV. DISCUSSION

As discussed above, there are no material factual issues in dispute in this adversary proceeding. Instead, at the heart of

4. In sum, the $499,200.00 figure was determined as follows. Super Stop made an initial bid deposit of $900,000.00 for all 81 of the properties on which it bid. It admits that it forfeited $230,000.00 for failing to proceed to closing on the 16 awarded units, thereby reducing the deposit amount to $670,000.00. Subtracting $170,800.00, which NRC has already refunded, results in a total of $499,200.00 that Super Stop claims it is still owed.

5. The four affirmative defenses are, briefly, as follows:
 (1) The complaint fails to state a claim against Clark or NRC upon which relief may be granted.
 (2) Super Stop's claim is barred, in whole or in part, by the doctrine of waiver.
 (3) Super Stop's claim fails, in whole or in part, because Clark, NRC and the applicable mortgage holders have a right of setoff against Super Stop in the amount of the

additional earnest money deposit for the 16 units that were awarded to Super Stop. (4) Clark and NRC reserve their rights to rely on any additional defenses and to amend their answers for the purpose of asserting any such additional affirmative defenses.
*See* Clark's and NRC's November 21, 2003 answers at pp. 7–9 and 9–11, respectively. Only the second and third affirmative defenses are raised in the instant matter, as well as the additional defense of equitable estoppel, and portions of this Opinion are so limited to same.

6. More specifically, Clark and NRC allege that the entire earnest money amount consists of the initial deposit paid by Super Stop on the 16 awarded units, plus the additional or supplemental deposit required under the PSA that Super Stop did not pay, but that NRC reallocated from the initial deposit Super Stop made on the 65 unawarded properties.

the matter is the proper interpretation of the governing contractual documents executed by the parties. Accordingly, the dispute may be resolved by means of summary judgment.

### A. Interpretation of the Contractual Documents

#### 1. The Validity of the Allocation

■ The initial focal point of any contract analysis is the language in the contract itself. *Much v. Pac. Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir.2001) (citation omitted); *Church v. Gen. Motors Corp.*, 74 F.3d 795, 799 (7th Cir.1996). The parties here executed various contractual documents in connection with the sale of Clark's properties. However, the relevant documents in this matter are the Bidding Procedures and the PSA.[7] Accordingly, the Court will focus its analysis on the interpretation of the language in these two documents.

■ State law determines the rules governing contract interpretation. *N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 652 (7th Cir.1998) (citations omitted). The parties agree that the applicable documents should be governed by and enforced in accordance with the laws of Illinois. Thus, the Court looks to Illinois law in construing the pertinent contractual provisions.[8]

■ Illinois courts use the "four corners" approach to contract interpretation, confining their attention to only that which appears within the four corners of the relevant documents. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir.1998) (citation omitted); *see also Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873–74 (7th Cir.2001) (citation omitted) (finding that if a contract is unambiguous, a court "will not look beyond its 'four corners' in interpreting its meaning"). If the language of a contract can be interpreted in only one way, the case is over. *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 574 (7th Cir.1995) (citations omitted). In interpreting contracts, the overriding concern is to give effect to the intent of the parties. *Church*, 74 F.3d at 799 (citation omitted).

■ The Court's first task is to decide whether the contractual documents at issue are ambiguous or unambiguous. It is well established that this determination is a question of law. *Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir.2000) (citation omitted); *Tingstol Co. v. Rainbow Sales Inc.*, 218 F.3d 770, 772 (7th Cir.2000) (citations omitted); *Anstett v. Eagle–Picher Indus., Inc.*, 203 F.3d 501, 503 (7th Cir.2000).

■ A contract is ambiguous if the language used is susceptible to more than one reasonable interpretation. *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1137–38 (7th Cir.2001) (citations omitted); *Bourke*, 159 F.3d at 1036 (citation omitted) ("In Illinois, '[a]n instrument is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning....'"); *Cent. States, S.E. & S.W. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 732 (7th Cir.1996) (citations omitted) ("When parties suggest different, yet reasonable interpretations of a contract, the contract is ambiguous."); *Murphy v. Key-*

---

7. The Bidding Procedures provide that "[e]ach Bid contained in a Bid Offer Form shall be deemed to incorporate the PSA, the PSP [(Property Specific Package)] and the Auction Procedures and shall apply to each Fee Property or Lease that is the subject of the Bid as indicated in the Bid Offer Form." Bidding Procedures at p. 6 ("PSA").

8. The PSA expressly states that it is governed by Illinois law. PSA at ¶ 32.

*stone Steel & Wire Co.,* 61 F.3d 560, 565 (7th Cir.1995) (citation omitted) ("[A] contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract."). However, a contract is not rendered ambiguous merely because the parties disagree on the meaning of its terms. *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.,* 225 F.3d 876, 879 (7th Cir.2000) (citation omitted).

A contract that is susceptible to only one reasonable interpretation is unambiguous, and a court must determine its meaning as a matter of law. *Moriarty v. Svec,* 164 F.3d 323, 330 (7th Cir.1998) (citation omitted); *Murphy,* 61 F.3d at 565 (citation omitted). Where a contract's provisions are clear, a court will enforce them according to their ordinary and plain meaning. *Interim Health Care,* 225 F.3d at 879 (citation omitted); *Grun v. Pneumo Abex Corp.,* 163 F.3d 411, 420 (7th Cir. 1999) (citation omitted) ("Courts must interpret the express terms of a [contract] 'in an ordinary and popular sense as would a person of average intelligence and experience....' "); *Bourke,* 159 F.3d at 1036 (citation omitted) (" 'The terms of an agreement, if not ambiguous, should be generally enforced as they appear, and those terms will control the rights of the parties.' ").

Further, a contract must be construed as a whole; that is, sentences must not be read in isolation, as each takes meaning from others in the same document. *Bourke,* 159 F.3d at 1038 (citation omitted). Courts presume that each provision in a contract was inserted deliberately and for a reason. *Atl. Mut. Ins. Co. v. Metron Eng'g & Constr. Co.,* 83 F.3d 897, 900 (7th Cir.1996) (citation omitted). Finally, courts will not add language to an agreement, nor add words or terms to a contract, to change its plain meaning.

*Grun,* 163 F.3d at 420 (citation omitted) ("[W]hen a contract is unambiguous, '[w]e refuse to indulge in judicial activism' by 'constru[ing] the [contract] beyond its clear and obvious language....' "); *Sheehy v. Sheehy,* 299 Ill.App.3d 996, 234 Ill.Dec. 34, 702 N.E.2d 200, 204 (1998). *See also Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1273 (7th Cir.1996) (declining the "invitation" to add terms to the agreement at issue in order to decipher its silence).

Applying these well established contract principles, the threshold inquiry is whether the controlling contractual documents in this matter are clear or ambiguous. The Court begins by examining the relevant language in both the Bidding Procedures and the PSA. The Bidding Procedures speak directly to both the initial bid deposit and the additional earnest money requirements, providing in pertinent part as follows:

> *Bid Deposits.* Bidders must include a deposit (a *"Bid Deposit"*) with their Bid by certified or cashier's check made payable to National Real Estate Clearinghouse, Inc. For a ... "Multiple Bid," the Bid Deposit shall be the greater of (i) 2.5% of the aggregate amount bid for all Properties and (ii) $10,000 multiplied by the number of Fee Properties and Leases in the Bid.... Successful Bidders must increase their Bid Deposit to 10% of the bid price by certified or cashier's check made payable to National Real Estate Clearinghouse, Inc. (but not less than $10,000) within two (2) days after acceptance of their Bid by the applicable Seller and Mortgage Holder.

Bidding Procedures at pp. 5–6. The PSA echoes the above language delineating the initial amount that bidders making multiple bids are required to pay. *See* PSA at ¶ 2(a). The PSA also defines, addresses, and elaborates on the additional earnest

money required by a bidder whose bids are accepted:

> Additional Earnest Money (Bid Deposit and Additional Earnest Money are collectively referred to as "Earnest Money") payable by certified or cashier's check made payable to NRC. The Additional Earnest Money is the difference between 10% of the aggregate Real Property Purchase Price for all Real Property and Owned Personal Property for which Purchaser is the successful bidder and the Bid Deposit.... The Additional Earnest Money shall be paid by Purchaser to NRC within two (2) days after Purchaser is notified by NRC of the acceptance of Purchaser's offer set forth in this Agreement.... Except as otherwise expressly provided in this Agreement, the Earnest Money shall be non-refundable.

PSA at ¶ 2(b). Finally, the Bidding Procedures expressly set forth the terms and conditions for the return of deposits for "non-conforming" or "rejected" bids:

> *Return of Deposits—Non–Conforming, or Rejected Bids.* Bid Deposits for non-conforming or rejected Bids will be returned via certified mail approximately seven (7) days after the entry of an order approving the sale of the Fee Property or Lease which is the subject of such non-conforming or rejected bid. Notwithstanding the return of the Bid Deposit for a rejected Bid, such Bid shall remain in full force and effect until the expiration of the Non–Revocation Period.[9]

Bidding Procedures at p. 7.

The parties on both sides urge that the language in the contractual documents is unambiguous and bolsters their own interpretation. While both sides may be

wrong, both cannot be right. *See Bourke,* 159 F.3d at 1037. If the Court finds that one suggested construction is reasonable, a determination must be made as to whether the other interpretation is also reasonable. *See id.* If it is, then the language used is fairly susceptible to more than one meaning, and the contractual documents are ambiguous. *Thomas,* 251 F.3d at 1137–38 (citations omitted).

Clark's interpretation relies on the absence of language in the documents. That is, Clark argues that there are no contractual provisions prohibiting NRC from reallocating the initial bid deposits for stores not awarded to Super Stop to fund the additional earnest money requirement for the awarded units. In support of its interpretation, Clark also points to the language in the Bidding Procedures appearing under the subhead "Additional Terms of Sale," which provides in pertinent part that "[a]t or before the Sale Hearing, such other and additional terms and conditions may be imposed as determined to be in the best interests of the bankruptcy estate, creditors, and other parties in interest...." Bidding Procedures at pp. 12–13.

Super Stop admits that by failing to deposit additional earnest money and proceed to closing, it defaulted on the awarded properties and forfeited the initial bid deposits on those units. However, Super Stop contends that, notwithstanding the default, NRC had no authority under the contractual documents to apply the initial bid deposits for the unaccepted bids to meet the additional earnest money requirement for the awarded stores.

▮ Based on the foregoing, the Court finds as a matter of law that the Bidding Procedures and the PSA are unambiguous.

---

9. The "Non–Revocation Period" is defined as the period 90 days after the bid deadline of July 1, 2003. *See* Bidding Procedures at pp. 2 ("Bid Deadline") and 6 ("Non–Revocation of Bids"). *See also* PSA at ¶ 6 ("Non–Revocation of Bid").

Further, the Court finds that Super Stop's interpretation of the contractual documents is fair and sensible, while Clark's position is both unreasonable and untenable. Clark does not dispute that the documents fail to expressly grant it or its agents the authority to reallocate the funds at issue. In fact, Clark tacitly admits that it drafted incomplete contractual documents by acknowledging that NRC "developed a solution"—the reallocation—to prevent Super Stop from defaulting. Without authority under the documents, this it could not properly do. If Clark had wished the contractual documents to contain a provision permitting the reallocation, then it could very easily have drafted such a provision with clear and explicit language. In both the Bidding Procedures and the PSA, as well as the other documents related to the sale of the properties, Clark included specific language indicating that it knew how to expressly define and construct contractual terms, rights, and powers in order to protect its interests. Courts assume that documents with comprehensive details include all of the provisions that its drafters intended. *See Caisse Nationale*, 90 F.3d at 1273. Accordingly, the Court refuses to "indulge in judicial activism" by adding language to the documents to allow the reallocation, thus changing the plain meaning of the agreement. The Court is simply not free to permit one party to act unilaterally if not explicitly provided for under contract. *See Grun*, 163 F.3d at 421–422. Thus, the Court will not infer the reallocation urged by Clark and NRC when none was expressly drafted in the contractual documents prepared by Clark.

 Moreover, reading the contractual documents together and as a whole, the Bidding Procedures unequivocally state that deposits made for rejected bids will be returned to the bidder about a week after entry of an order approving the sale of the properties. Bidding Procedures at p. 7. Such an assertion is eviscerated if Clark is allowed to unilaterally reallocate those bid deposits made on unawarded stores to satisfy the additional earnest money obligation for the awarded stores. The Court must give effect, to the extent possible, to all contractual provisions, reviewing each in light of all of the others. *Atl. Mut. Ins. Co.*, 83 F.3d at 901 (citation omitted). By the same token, courts are not at liberty to ignore agreed upon contractual terms. *See Grun*, 163 F.3d at 421–422 (citation omitted).

Clark's reliance on the catchall provision in the "Additional Terms of Sale" clause is reaching and rather disingenuous. If the Court were to adopt Clark's position—that this clause permitted the reallocation at issue—Clark would, in effect, be permitted to do virtually anything it desired pursuant to the contractual agreement. The Court is not willing to create so great a slippery slope down which Super Stop and other bidders would find themselves plummeting by espousing Clark's interpretation. Further, the plain language of the clause does not support Clark's contention that its reallocation was valid. While applying the initial deposits for the unaccepted bids to the additional earnest money requirement for the accepted bids may have been "in the best interests of the bankruptcy estate," in particular, Clark, NRC, and the applicable mortgagees, certainly it can be persuasively argued that the reallocation did not benefit Super Stop, who, as a bidder, is clearly a "party in interest."

Moreover, although Super Stop made bids for all 81 properties under the same PSA, the agreement is divisible into distinct, independent contracts for each unit. As such, Clark had no authority to apply the initial deposits for bids on stores not awarded to Super Stop to meet the addi-

tional earnest money obligation on the 16 stores that were awarded.

There is no exact test for deciding whether a contract is entire or divisible. *Keeshin v. Levin*, 31 Ill.App.3d 790, 334 N.E.2d 898, 904 (1975); *White Brass Castings Co. v. Union Metal Mfg. Co.*, No. 13182, 1907 WL 2037, at *6 (Ill.App.Ct. 1907) (citation omitted). Instead, the determination generally turns on the intention of the parties as established by a reasonable interpretation of the terms and provisions of the contractual document itself, by the circumstances of the transaction at issue, and by the subject matter to which the contract has reference. *Trapkus v. Edstrom's Inc.*, 140 Ill.App.3d 720, 95 Ill.Dec. 119, 489 N.E.2d 340, 346 (1986) (citations omitted). A contract is deemed divisible where one party's performance consists of several distinct and separate parts and the price to be paid by the other party is apportioned to each of these parts. *Altra Corp. v. Chemtoy Corp. (In re Chemtoy Corp.)*, 19 B.R. 475, 481 (Bankr.N.D.Ill. 1982) (citations omitted).

In the matter at bar, the relevant contractual documents are replete with terms and provisions indicating that the parties intended to enter into a divisible agreement. The retail units were priced separately, and bidders were required to submit a separate bid price for each store. *See* PSA at Ex. A; Bidding Procedures at p. 6 ("Bid Allocations"). The sale of each property had to be and was authorized by separate court order. PSA at ¶ 4 ("Court Approval of Sale"). Further, the sale of each unit was explicitly subject to a "Property Specific Package," containing due diligence information and specific bidding documents unique to each store. Bidding Procedures at p. 1. The PSA also contemplated separate warranties, inspections, closing documents, and closings for each retail unit. *See* PSA at ¶¶ 11–15 and 20.

Each property was sold with various fixtures and inventory; some were subject to liens, while others were not. *See* Bidding Procedures at pp. 3–4. Finally, environmental conditions and remedial obligations varied widely, depending on the location and condition of the particular store. *See* PSA at ¶ 21.

While the PSA here is clearly a single contract, in the Court's view, it is divisible on a store by store basis. Therefore, Clark had no authority to reallocate the initial bid deposits for properties not awarded to Super Stop in order to satisfy the additional earnest money requirement on completely separate units that were awarded to Super Stop.

Finally, NRC's reallocation violated the duty of good faith and fair dealing. Every contract in Illinois contains an implied promise of good faith and fair dealing between the contracting parties, absent express disavowal. *Interim Health Care*, 225 F.3d at 884 (citation omitted). Problems involving good faith performance most commonly occur when one party is given broad discretion and the other must hope that that discretion is exercised evenhandedly. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir.2003) (citations omitted); *Interim Health Care*, 225 F.3d at 884 (citation omitted). In such a case, the party with discretion must use it "reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties." *Interim Health Care*, 225 F.3d at 884 (citation omitted).

As discussed above, the contractual documents in this matter did not expressly permit NRC, on Clark's behalf, to unilaterally reallocate the funds at issue. Such a reallocation undoubtedly came as a surprise to Super Stop, especially after it

had received acceptance letters from NRC which provided Super Stop with an openended opportunity to request a refund of the deposits for the unawarded properties.[10] As the reallocation was inconsistent with Super Stop's reasonable expectations, Clark and NRC violated the duty of good faith and fair dealing, and the reallocation was, therefore, invalid.

### 2. The Amount to Which Clark Is Entitled as Liquidated Damages

Clark contends that the Bidding Procedures and the PSA imposed on Super Stop an "unconditional obligation" to pay the additional earnest money within two days of being notified that its bids had been accepted. In extending this argument, Clark seems to suggest that NRC had no choice but to reallocate the funds already being held for unaccepted bids so that the additional earnest money deposit requirement for the accepted bids could be satisfied. However, there was another alternative: Super Stop could default on the agreement as, indeed, it concedes that it did. Clark anticipated such a scenario by including paragraph 18 in the PSA, which reads in pertinent part as follows:

> *BREACH OF AGREEMENT BY PURCHASER.* In the event the purchase and sale hereunder is [sic] not closed by reason of Purchaser's default hereunder ... then, upon receipt of written notice from Seller, Title Company shall deliver the Earnest Money to Seller as full liquidated damages for Purchaser's default.... [11] The parties hereto expressly

acknowledge that it is impossible to estimate more precisely the damages to be suffered by Seller upon such event, and that the Earnest Money is intended not as a penalty, but as full liquidated damages. The parties further acknowledge that the amount of the Earnest Money represents a reasonable estimate by the parties of the amount of the loss that Seller expects to suffer in the event the sale or purchase of the Property is not closed because of Purchaser's default.... In the event the purchase and sale contemplated in this Agreement is [sic] not consummated because of Purchaser's default ..., Purchaser hereby waives and releases any right to (and hereby covenants that is shall not) sue Seller to recover the Earnest Money or any part thereof on any grounds, including, without limitation, that it is unreasonable in amount or that its retention by Seller is a penalty and not agreed upon and reasonable liquidated damages. Any breach under any other agreement to purchase Property entered into by Purchaser or its affiliates shall be considered a breach under this Agreement.

> This [sic] provisions of this Paragraph 18 shall survive the termination of this Agreement.

PSA at ¶ 18.

 In interpreting contractual provisions that designate damages like paragraph 18 above, Illinois courts distinguish between liquidated damages, which

---

10. The letters sent by NRC notifying Super Stop that its bids had been accepted for, at the time, 18 of the 81 stores on which it had bid failed to designate a deadline by which Super Stop was required to request a refund of the deposits for the unawarded stores. See the Court's discussion on waiver, *infra,* in Part IV.B.1.

11. None of the contractual documents include a provision indicating transfer of funds from NRC to a title company. The Court presumes that any references in the documents to a title company are the result of a scrivener's error because all of the deposits were made to NRC, and no title company has been named or identified as a necessary party in this action.

are enforceable, and penalties, which are not. *Checkers Eight Ltd. P'ship v. Hawkins,* 241 F.3d 558, 561–62 (7th Cir.2001) (citation omitted). Courts will usually enforce a liquidated damages provision where it can be shown that (1) the actual damages from a breach would be difficult to measure at the time the contract was made, and (2) the specified amount of damages is reasonable, given the anticipated or actual loss caused by the breach. *Id.* at 562 (citations omitted); *Am. Nat'l Bank & Trust Co. of Chi. v. Reg'l Transp. Auth.,* 125 F.3d 420, 440 (7th Cir.1997) (citation omitted). Whether a damages provision is a liquidated damages clause or a penalty clause is a question of law. *Raffel v. Medallion Kitchens of Minn., Inc.,* 139 F.3d 1142, 1145–46 (7th Cir.1998) (citation omitted); *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1290 (7th Cir.1985) (citations omitted).

By its plain language, paragraph 18 of the PSA is an enforceable liquidated damages provision. The amount of damages was uncertain at the time that the contract was executed, and the damages specified are not excessive or unreasonable compared to actual damages. The parties in this matter do not dispute the characterization of paragraph 18 as a liquidated damages clause, nor do they contest the enforceability of the provision. Rather, the parties' dissension focuses on the meaning of "earnest money" and, therefore, on the actual amount of damages to which Clark is entitled as a result of Super Stop's default.

■ Super Stop urges that only the initial bid deposit that it actually paid for the accepted bids must be forfeited. In contrast, Clark contends that, pursuant to the liquidated damages provision, it is entitled to both the initial bid deposit that Super Stop paid and the additional earnest money required for the 16 stores that Super Stop failed to pay. In support of its argument, Clark points to paragraph 2(b) of the PSA, which provides that "Bid Deposit and Additional Earnest Money are collectively referred to as 'Earnest Money'." PSA at ¶ 2(b). According to Clark, paragraph 18's reference to "earnest money," therefore, means that it is entitled to both the bid deposit and the additional earnest money as liquidated damages as a result of Super Stop's default.[12]

The Court fully acknowledges the PSA's definition of "Additional Earnest Money" as encompassing both the initial bid deposit and the additional earnest money. However, this definition must be read within the context of both the entire document and the Bidding Procedures. Both of the contractual documents designate several points in the bidding process at which the buyer is required to make various payments. In particular, Paragraph 2(b) of the PSA notes that "Additional Earnest Money" to bring the total deposit to 10 percent of the full bid price of each unit to be purchased "shall be paid *by the Purchaser* to NRC within two (2) days after Purchaser is notified by NRC of the acceptance of Purchaser's offer...." PSA at ¶ 2(b) (emphasis added). According to the liquidated damages provision in the same document, in the event that the property transaction is not closed by reason of the purchaser's default, the title company must then "deliver the Earnest Money to

---

12. Clark also alleges that, pursuant to paragraph 18 of the PSA, Super Stop waived its right to sue Clark to recover "the Earnest Money or any part thereof on any grounds...." PSA at ¶ 18. This contention puts the cart before the horse, as the Court must first determine the precise meaning of "earnest money." As the following discussion reveals, the Court's determination renders moot Clark's allegation that Super Stop waived its right to sue Clark.

Seller as full liquidated damages for Purchaser's default."[13] PSA at ¶ 18. Read together, the language of the PSA provides that Clark was entitled to retain only the money being validly held by NRC. The only funds paid *by* Super Stop to NRC, as required under the PSA, consisted of the initial bid deposits. Any other monies being held were those for the unaccepted bids that had been improperly reallocated by NRC. Nothing in the plain language of these provisions suggests that Clark is entitled to funds other than those properly held by NRC. The Court will not add words to the PSA or construe the agreement beyond its clear and obvious meaning. *See Grun*, 163 F.3d at 420 (citation omitted).

Clark claims that the Bidding Procedures and the PSA expressly state that any failure by Super Stop to proceed to closing will result in the forfeiture of the entire earnest money amount. In fact, the Bidding Procedures explicitly provide that in the event of default, Super Stop's forfeiture is limited to its initial bid deposit: "Failure to close in a timely fashion[,] in accordance with the PSA, will result in the forfeiture of the Bidder's *Bid Deposit.*" Bidding Procedures at p. 11, "Closings" (emphasis added). NRC apparently understood the forfeiture to be limited to the initial bid deposit as well, as evidenced by the language of the "notice of default" letter it sent for each applicable property. The text of each letter reads, in its entirety: "Dear Bidder: Please be advised that you have defaulted on the above referenced property. Per the Bidding Procedures, your *bid deposit* will not be returned to you." Gladstone Aff. at Ex. G (emphasis added).

In sum, construing the contractual documents as a whole supports Super Stop's contention that Clark is entitled to liqui-dated damages in the amount of only the initial bid deposits that Super Stop actually made for the 16 awarded properties. This conclusion is bolstered by considering the relevant contractual term "earnest money" according to its ordinary meaning. *Black's* defines "earnest money," in pertinent part, as "[a] deposit paid (usu. in escrow) by a prospective buyer (esp. of real estate) to show a good-faith intention to complete the transaction, and ordinarily forfeited if the buyer defaults." BLACK'S LAW DICTIONARY 525–26 (7th ed.1999). Although Super Stop, the "prospective buyer," made an initial deposit contemporaneously with the submission of its bid in good faith, it failed to pay the additional money required for the awarded units within two days after the written acceptance of its bids. Thus, Super Stop defaulted under the terms of the contractual agreement on July 18, 2003 and July 23, 2003. Clark did not formally declare Super Stop in default, however, until August 20, 2003, over two weeks after Super Stop submitted two formal requests for return of the initial deposits for its unaccepted bids. As seasoned business entities, Clark and NRC should have known better than to accept Super Stop's contentions that it intended to complete the transactions without the additional good-faith deposit to support its claims. Only the money that Super Stop actually deposited was paid in earnest, and, therefore, only the initial bid deposit for the 16 stores was "earnest money," according to the ordinary meaning of the term.

 Finally, despite Clark's urging that the PSA's express definition of "earnest money" is controlling, a literal interpretation may be disregarded when such a reading would produce nonsensical results. *Beanstalk Group, Inc. v. AM Gen. Corp.,*

---

**13.** See footnote number 11.

283 F.3d 856, 859–60 (7th Cir.2002) (citations omitted); *Level 3 Communications, Inc. v. Fed. Ins. Co.*, 168 F.3d 956, 958 (7th Cir.1999) (citations omitted). Instead, the Court must consider both the language and the logic of the provisions of the contractual documents and interpret them "in light of the concrete circumstances in which [they were] written." *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir.1995) (citations omitted). Indeed, contract clarity is a function of "the correspondence between the contract and the things or activities that it regulates, and not just of the semantic surface." *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 575 (7th Cir.1995). Here, under the liquidated damages provision of the PSA, NRC could logically deliver to Clark only those funds that it validly held, as discussed above. Entitling Clark to money over and above the initial deposits actually paid by Super Stop in earnest would both be illogical and lead to an unreasonable result from any bona fide purchaser's perspective. In sum, after considering the entire text of the agreement, the logic of the contractual documents, and the circumstances under which they were written, the Court concludes that Clark is entitled to liquidated damages in the amount of the initial bid deposits validly held by NRC.

## B. Clark's Affirmative Defenses

Clark and NRC alternatively assert three affirmative defenses. Specifically, they contend that, in the event the Court finds that NRC's application of the initial deposits was invalid, they must still prevail because (1) Super Stop waived its right to object to the reallocation; (2) Super Stop is barred from seeking a refund by the doctrine of equitable estoppel; and/or (3) any claim that Super Stop has for the return of the deposits is subject to Clark's right of setoff.

## 1. Waiver

Clark first claims that Super Stop waived any right it had to object to NRC's reallocation by failing either to separately pay the additional earnest money required by the deposit deadline or to request a refund of the initial bid deposits before that date. According to Clark, Super Stop knew of the deadline but failed to act. Thus, Clark contends, Super Stop is precluded from objecting to NRC's reallocation under the doctrine of waiver.

■■■■■ Waiver is the voluntary and intentional relinquishment of a known right, privilege, or claim. *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1393 (7th Cir.1994) (citation omitted); *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1337–38 (7th Cir.1992) (citation omitted); *Herzog v. Leighton Holdings, Ltd.*, 239 B.R. 497, 509 (N.D.Ill.1999) (citation omitted). It can arise either expressly or from conduct that is inconsistent with an intent to enforce that right. *Horbach v. Kaczmarek*, 915 F.Supp. 18, 23 (N.D.Ill. 1996) (citation omitted). "[A] prerequisite ingredient of the waiver of a right or privilege consists of an intention to relinquish it." *TMF Tool Co., Inc. v. Siebengartner*, 899 F.2d 584, 590 (7th Cir.1990) (citation omitted). Before a party is considered to have waived a right, "a clear and distinct manifestation of such an intent must be found." *Am. Nat'l Bank & Trust Co. of Chi. v. K–Mart Corp.*, 717 F.2d 394, 398 (7th Cir.1983) (citation omitted). In particular, implied waiver requires that an intention to waive be plainly inferred from the circumstances and that the waiving party make a "clear, unequivocal, and decisive act" indicating such waiver. *Herzog*, 239 B.R. at 509 (citation omitted); *City of Chi. v. Mich. Beach Hous. Coop.*, 242 Ill. App.3d 636, 182 Ill.Dec. 343, 609 N.E.2d

877, 887 (1993) (citations omitted). Where the material facts are not in dispute and only one reasonable inference can be drawn therefrom, courts may decide whether a party has waived its rights as a matter of law. *Horbach,* 915 F.Supp. at 23 (citation omitted). Finally, whether waiver has arisen is determined by the circumstances of each particular case. *City of Chi.,* 182 Ill.Dec. 343, 609 N.E.2d at 887 (citation omitted).

■ The Court holds as a matter of law that the facts in the instant matter indicate that Super Stop did not knowingly or intentionally waive its right to object to NRC's reallocation. Here, Clark relies on little more than the fact that Super Stop failed either to deposit the additional earnest money required or to request a refund of the initial bid deposits within two days of being notified that its bids for the various properties had been accepted. As discussed above, the legal effect of Super Stop's failure to separately increase its initial bid deposit was not waiver of its right to either request a refund or object to NRC's reallocation, but to be declared in default of its contractual agreement. The record is silent as to why Super Stop sat on its hands, waiting until July 28, 2003 to request a return of the initial deposits for the first time. However, none of the acceptance letters designated a deadline by which Super Stop was required to act in order to be refunded its initial deposits. Although the letters noted that sufficient funds for the 10 percent earnest money deposit were being held by NRC, they failed to specifically state that these funds would be applied if Super Stop did not request their return within two days. Even if the letters had included such a caveat, however, the contractual documents in this matter did not grant Clark or NRC a right to unilaterally impose a

deadline on Super Stop to either request a refund or object to NRC's reallocation.

Moreover, there is certainly sufficient evidence that Super Stop did not intentionally waive its right to request a refund or object to the reallocation. That Super Stop did indeed request a refund, albeit a few days after the final deadline for the payment of additional earnest money, negates the fact that Super Stop consented to the reallocation and evidences its intent to enforce its rights. Clark has failed to show either "a clear and distinct manifestation" of Super Stop's intent to waive its rights or a "clear, unequivocal and decisive act" by Super Stop indicating such waiver. Consequently, the Court concludes as a matter of law that Super Stop did not waive its right to object to the reallocation or to request a refund of the initial bid deposits.

#### 2. Equitable Estoppel

Clark's next contention is that Super Stop is barred from seeking a refund of its initial bid deposits by the doctrine of equitable estoppel. Specifically, Clark claims that NRC construed Super Stop's failure to object to the application of the initial bid deposits to satisfy the additional earnest money obligation before the deadline as consent to the reallocation. According to Clark, NRC then reallocated the money in reliance on Super Stop's silence.

■ Estoppel arises when one has made a misleading representation to another and the one misled has reasonably relied to his detriment on that representation. *Black v. TIC Inv. Corp.,* 900 F.2d 112, 115 (7th Cir.1990) (citations omitted); *Citation Cycle Co., Inc. v. Yorke,* 693 F.2d 691, 695 (7th Cir.1982) (citation omitted) ("Estoppel 'arises ... when one has so acted as to mislead another and the one thus misled has relied upon the action of the inducing party to his prejudice.' ").

"The reasons for the general application of estoppel are simple enough—the doctrine prevents a party from benefiting from its own misrepresentations." *Black,* 900 F.2d at 115. The Seventh Circuit has indicated that application of the doctrine of equitable estoppel is particularly appropriate in bankruptcy proceedings. *Citation Cycle Co.,* 693 F.2d at 694.

■■■■ There are four requirements to establish a claim of estoppel: (1) the party to be estopped must know the facts and must intend, or lead the other party to believe it intended, that its conduct will be acted upon; (2) the party seeking estoppel must be ignorant of the true facts; (3) the party asserting the estoppel must have actually and reasonably relied on the words or conduct; and (4) the reliance must have caused the party asserting the estoppel injury. *McConahey v. United States (In re McConahey),* 192 B.R. 187, 192 (Bankr.S.D.Ill.1996) (citations omitted). In contrast to waiver, estoppel focuses on the effects of the obligor's conduct on the obligee—not on the obligor's intent. *Wald v. Chi. Shippers Ass'n,* 175 Ill.App.3d 607, 125 Ill.Dec. 62, 529 N.E.2d 1138, 1148 (1988) (*citing Saverslak v. Davis–Cleaver Produce Co.,* 606 F.2d 208, 213 (7th Cir.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980)). However, estoppel does require a knowing misrepresentation, which, in turn, requires an intent to mislead. *Cent. States, S.E. & S.W. Areas Pension Fund v. Kroger Co.,* 226 F.3d 903, 914 (7th Cir. 2000) (*citing Coker v. Trans World Airlines, Inc.,* 165 F.3d 579, 585–86 (7th Cir. 1999)). In order to prevail on a theory of estoppel, a party must establish by "clear and unequivocal" proof that it relied on representations or acts of the other party and had "no knowledge or convenient means of knowing the true facts." *Wald,*

125 Ill.Dec. 62, 529 N.E.2d at 1148 (citations omitted).

■■■■ On the basis of the record, the Court finds that proof of each element required for estoppel is not present and that Super Stop is, therefore, not precluded from either seeking a refund of the initial bid deposits or challenging NRC's reallocation. It is not at all clear that Super Stop had full knowledge that its failure to object to NRC's reallocation of the initial deposits for the 65 unawarded stores before the deadline would result in the application of those funds to meet the additional earnest money requirement on the 16 awarded stores or that it intended to mislead Clark or NRC in any way. Nor does it appear that Super Stop engaged in knowing, affirmative misrepresentation by telling Clark that it was going to follow through with the purchase of the 16 retail units, which it subsequently did not. Super Stop could have had every intention of consummating the transaction, but circumstances may have prevented it. Alternatively, Super Stop could have decided for a variety of business reasons not to close the deals for the 16 stores and to suffer the loss of its initial deposits made therefor.

In addition, Clark's reliance on Super Stop's silence does not seem reasonable. Neither Clark nor NRC made any inquiries as to whether Super Stop was going to remit the additional required earnest money or request a refund, even though either party could have conveniently learned of the true facts by making a simple telephone call to Super Stop. Instead, NRC just assumed that Super Stop was not going to make the additional payment and then reallocated the money without further contacting Super Stop. Finally, Clark and NRC have been unable to show on this record that their alleged reliance on Super Stop's inaction caused them any injury. Indeed, they benefited, until this point, by

retaining most of the bid monies paid on the 65 unawarded stores.[14]

In sum, Clark has failed to show by "clear and unequivocal" proof that Super Stop made a knowing misrepresentation on which Clark reasonably relied or that Clark had no knowledge or convenient way to discover the true facts. Accordingly, the Court finds without merit Clark's argument that Super Stop should be estopped from seeking a refund of its initial bid deposit or challenging NRC's reallocation.

### 3. Setoff

The final question for the Court to consider is whether Clark is entitled to a setoff against debt allegedly owed to it by Super Stop. Clark alleges that Super Stop's admitted contractual breach has given Clark a right to offset any remaining claim that Super Stop may have for the return of the initial bid deposits for the unaccepted bids against Clark's claim for the full 10 percent earnest money deposit for the awarded units.

 In general, the right of setoff allows parties that owe each other money "to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (*quoting Studley v. Boylston Nat'l Bank of Boston*, 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913)); *Mottaz v. St. Louis Post–Dispatch Pulitzer Publ'g Co. (In re Murphy)*, 203 B.R. 972, 975 (Bankr.S.D.Ill. 1997) (citation omitted) ("[T]he right of setoff allows parties that owe mutual debts to each other to assert the amounts owed on these debts, subtract one from the other, and then pay only the balance."). Setoff most commonly arises as a counterclaim or cross-claim demand interposed by a defendant against a plaintiff, originating from a transaction extrinsic to the plaintiff's cause of action. *Sylvester v. Martin (In re Martin)*, 130 B.R. 930, 938 (Bankr. N.D.Ill.1991) (citation omitted); *Bank of Chi.–Garfield Ridge v. Park Nat'l Bank*, 237 Ill.App.3d 1085, 179 Ill.Dec. 240, 606 N.E.2d 72, 75–76 (1992) (citations omitted). The burden of proving an enforceable right of setoff rests with the party asserting the right. *Harber Bros. Co. v. Moffat Cycle Co.*, 151 Ill. 84, 37 N.E. 676, 679 (1894); *Steinberg v. Schwartz*, No. 6817, 1920 WL 1195, at *3 (Ill.App.Ct. Oct. 1920). The right of setoff is within the discretion of the Court, exercised under the principles of equity. *See In re S. Indus. Banking Corp.*, 809 F.2d 329, 332 (6th Cir.1987) (citation omitted).

 Equitable setoff is available only where the debts at issue are mature, mutual, and "'of such a certain and ascertainable character as to be capable of being applied in compensation of each other' without the intervention of the court to estimate them." *Bank of Chi.–Garfield Ridge*, 179 Ill.Dec. 240, 606 N.E.2d at 76 (citations omitted). Although the Bankruptcy Code does not create a federal right of setoff, § 553(a) provides that, with various exceptions, "whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Md.*, 516 U.S. at 18, 116 S.Ct. 286. In addition to recognizing the doctrine of setoff, § 553 includes some further restrictions on its application.

---

**14.** Clark and NRC contend that Clark received almost $1.4 million less for the 16 properties from the next successful bidder as a result of Super Stop's breach. *See* Clark's and NRC's November 21, 2003 answers at pp. 8 and 10, respectively. Assuming arguendo that this contention is true, Clark has failed to establish the other elements required to prevail under the doctrine of equitable estoppel.

*In re Elcona Homes Corp.*, 863 F.2d 483, 484–85 (7th Cir.1988).

 The express language of § 553(a) permits only creditors to offset monies that they owe against debts owed by the debtor. 11 U.S.C. § 553(a) (2004) ("Except as otherwise provided ..., this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor...."). Nevertheless, courts have recognized a debtor's right to claim setoff as a defense under § 558.[15] *See, e.g., Martin*, 130 B.R. at 939. A debtor may assert a right to setoff, however, only to the extent that applicable state law acknowledges it. *See id.* (citations omitted).

Illinois courts have long acknowledged a right to setoff. *In re Doctors Hosp. of Hyde Park, Inc.*, 337 F.3d 951, 955 (7th Cir.2003) (noting Illinois courts' recognition of a common law right of setoff); *Harber Bros.*, 37 N.E. at 679; *Faber, Coe & Gregg, Inc. v. First Nat'l Bank of Chi.*, 107 Ill.App.2d 204, 246 N.E.2d 96, 99 (1969); *Eck v. Penn. R.R. Co.*, No. 34567, 1931 WL 2976, at *4 (Ill.App.Ct. Mar. 1931) ("[S]etoff ... [is] entirely the subject of statutory regulations."); *Sterling–Midland Coal Co. v. Great Lakes Coal & Coke Co.*, No. 30652, 1926 WL 3795, at *2 (Ill. App.Ct. Mar. 1926); *Hammans v. Powell Myers Lumber Co.*, No. 25618, 1920 WL 1290, at *1 (Ill.App.Ct. Nov. 1920); *Kingman v. Draper*, 14 Ill.App. 577, 1884 WL 10058, at *1 (Ill.App.Ct. Feb. 1884). In addition, Illinois law recognizes that a party can counterclaim based on setoff. *See* 735 ILCS 5/2–608(a) (2004) ("Any claim by one or more defendants against one or more plaintiffs, ... whether in the nature of setoff, recoupment, cross claim or otherwise, and whether in tort or contract, for liquidated or unliquidated damages, or for other relief, may be pleaded as a cross claim in any action, and when so pleaded shall be called a counterclaim.").

 In this matter, Clark has raised setoff as a defense to Super Stop's motion for summary judgment, not as a counterclaim. "Raising setoff as a defense is consistent with the rules of federal procedure." *Martin*, 130 B.R. at 939 (citing *Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)). As a result, Clark may claim a right of setoff as a defense in this adversary proceeding. However, in order to prevail, Clark must establish that its claim for the additional earnest money for the accepted bids and Super Stop's claim for the initial bid deposit refund for the unaccepted bids are (1) mature, (2) liquidated, and (3) mutual between the parties. *Bank of Chi.–Garfield Ridge*, 179 Ill.Dec. 240, 606 N.E.2d at 76 (citations omitted). Neither Clark nor Super Stop expressly contests that the alleged debts are mature or liquidated. Rather, the dispute implicitly centers on the mutuality of the claims.

 Both Illinois courts and § 553 of the Code require the existence of mutual debts and credits between the parties in the context of setoff. *Id.* (citation omitted); *Martin*, 130 B.R. at 940 (citations omitted). That is, "[m]utuality requires that something be 'owed' by both sides." *Murphy*, 203 B.R. at 975 (citation omitted). Courts have uniformly construed "mutuality" to mean that the " 'debts must be in the same right and between the same parties, standing in the same capacity and same kind or quality.' " *State of Ill. v. Lakeside Cmty. Hosp., Inc. (In re Lakeside Cmty. Hosp., Inc.)*, 151 B.R. 887, 891

**15.** Section 558 provides, in pertinent part, that "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate...." 11 U.S.C. § 558.

(N.D.Ill.1993) (citations omitted). "[M]utuality is satisfied when the offsetting obligations are held by the same parties in the same capacity ... and are valid and enforceable, and ... both offsetting obligations [must have] arise[n] either prepetition or postpetition, even if they arose at different times out of different transactions." *Doctors Hosp. of Hyde Park*, 337 F.3d at 955 (citations omitted).

 In this matter, both of the alleged debts arose postpetition. Clark's obligation to Super Stop arose when it failed to return the initial bid deposits made on properties not awarded at auction to Super Stop, while Super Stop's purported obligation to Clark arose when it failed to deposit additional earnest money for the awarded properties. Thus, both debts are in the same right. The obligations are also between the same parties. Finally, the parties are standing in the same capacity, as neither alleged debt arose in any kind of trust, fiduciary, or representative capacity. Although the Court can go through the mechanical process of applying the required factors to the matter at bar, the issue here, for purposes of the affirmative defense of setoff, is whether the debt that Clark claims is owing because of Super Stop's failure to separately deposit additional earnest money is a legal and enforceable obligation. Because the Court has already found that Clark is entitled to keep only the deposits actually made by Super Stop on the accepted bids for the subject 16 stores, the Court holds that the additional earnest money not paid by Super Stop is an unenforceable debt. To the extent the Court has discretion to allow application of the claimed setoff, the Court declines to so exercise it. Thus, there is no compelling basis for a setoff under the circumstances, and, accordingly, the Court concludes that Clark and NRC may not properly setoff the initial deposits made by Super Stop on the 65 stores for which Super Stop's bids were not accepted against the additional earnest money that Super Stop failed to pay for the 16 awarded stores.

## V. *CONCLUSION*

For the foregoing reasons, the Court grants Super Stop's motion for summary judgment, denies Clark and NRC's cross-motion for summary judgment, and orders Clark or NRC, on its behalf, to return to Super Stop the deposits paid for the unaccepted bids in the amount of $499,200.00.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

## *ORDER*

For the reasons set forth in a Memorandum Opinion dated the 29th day of April 2004, the Court grants the motion of Super Stop Petroleum, Inc. for summary judgment, denies Clark Retail Enterprises, Inc. and National Real Estate Clearinghouse, Inc.'s cross-motion for summary judgment, and orders Clark Retail Enterprises, Inc., or National Real Estate Clearinghouse, Inc. on its behalf, to return to Super Stop Petroleum, Inc. the initial deposits paid for the unaccepted bids in the amount of $499,200.00.